**UNITED STATES of America,**
**Appellee,**

v.

**Percy BRANKER, Grover Cooper, John L. Lacey, David Lopez, Charles Moore and John A. Ross, Jr., Defendants-Appellants.**

Nos. 271, 272, Dockets 30935, 30936.

United States Court of Appeals
Second Circuit.

Argued March 13, 1968.

Decided May 13, 1968.

A. Edward Grashof, New York City, (John T. Baker, New York City, on the brief), for appellant Branker.

Alan B. Adler, Yonkers, N. Y. (Adler & Adler, Yonkers, N. Y., on the brief), for appellant Cooper.

John F. X. Peloso, New York City, for appellant Lacey.

Louis Bender, New York City (Lloyd A. Hale, New York City, on the brief), for appellant Lopez.

Albert J. Krieger, New York City (Leonard H. Sandler, New York City, on the brief), for appellant Moore.

Sidney Meyers, New York City, for appellant Ross.

John E. Sprizzo, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, and David M. Dorsen and James W. Brannigan, Jr., Asst. U. S. Attys., on the brief), for appellee.

Before KAUFMAN and HAYS, Circuit Judges, and RYAN, District Judge.*

HAYS, Circuit Judge:

The six appellants,[1] two of whom are former employees of the Internal Revenue Service and four of whom are persons with whom these employees dealt, were convicted after a nine-week jury trial of various offenses arising out of fraudulent schemes to avoid payment of income taxes and to obtain tax refunds to which the recipients were not entitled. Appellants were tried together with two other defendants[2] on eighty-one counts drawn from two indictments consolidated for trial. The first count charged a conspiracy among all defendants. The other counts charged substantive offenses involving defendants

---

* Of the District Court for the Southern District of New York, sitting by designation.

1. Percy Branker, Grover Cooper, John L. Lacey, David Lopez, Charles Moore, and John A. Ross, Jr.

2. Frank McClary, Jr. and Catherine Wood.

No

both singly and in various combinations. At the close of the government's case, the trial judge dismissed the conspiracy count [3] and eighteen substantive counts as to all defendants, and dismissed five counts as to certain of the defendants named therein. The jury acquitted appellant Cooper on a count charging him with impersonating an officer and employee of the United States, but convicted the appellants and defendant Catherine Wood [4] on all of the remaining counts in which they were charged.

Appellants' principal contention on appeal is that their motions for separate trials should have been granted after the conspiracy count was dismissed at the close of the government's case. An understanding of this issue requires some familiarity with the charges in the indictments and the evidence adduced to support them.

## THE INDICTMENTS

The consolidated indictments, which contained eighty-four counts, named twelve persons as defendants and six additional persons as co-conspirators. Four defendants were granted severances prior to trial.[5]

Count one charged all defendants with a conspiracy to commit various crimes relating to income tax returns. In essence, the count alleged that the conspiracy was designed to enable certain persons to avoid payment of taxes which were due and owing and to secure for these persons and others income tax refund checks to which they were not entitled.

The substantive counts can be classified in several categories:

1. Thirty-eight counts charged various defendants with making opportunities for a number of persons to defraud the United States in violation of 26 U.S.C. § 7214(a) (5):

Counts 2 through 20 [6] charged appellant Lacey with causing defendant Neely to process certain tax returns so as to avoid an audit.

Counts 21 through 37 charged appellant Ross with causing Neely to process certain other tax returns so as to avoid audit.

Count 83 charged appellants Moore and Cooper with causing defendant Neely to process Moore's 1959 tax return so as to make it appear that the tax due and owing had been fully paid.

Count 84 charged appellants Moore, Cooper and Lacey and defendant Bayley with causing Bayley and defendant Neely to transfer an Unidentified Taxpayer's Account to Moore's account although they knew that he was not entitled to it. The trial court dismissed this count as to Moore and Cooper.

2. Eighteen counts charged various defendants with making and causing to be made false, fictitious and fraudulent claims against the United States in violation of 18 U.S.C. § 287:

Counts 38 through 49 charged appellants Cooper and Branker with presenting and causing to be presented for payment tax refund checks payable to Branker although they knew that he was not entitled to such refunds.

Counts 62 through 64 charged appellants Lacey and Cooper and defendant McTootle with similar conduct in connection with refund checks payable to McTootle. The trial court dismissed these counts as to Lacey.

Counts 69 and 70 charged appellants Lopez and Cooper with similar violations

3. Since defendant McClary was named only in the conspiracy count, he was acquitted when that count was dismissed.

4. The trial court suspended imposition of sentence on defendant Wood, and she has not appealed.

5. Irving Tendrich was granted a severance because of a question as to his competency to stand trial. Ethel Ivy Neely,

Herman McTootle and Laurel Bayley were granted severances because they pleaded guilty to one or more counts of the indictment. Since Bayley was the only defendant charged in counts 80, 81 and 82, the number of counts involved in appellants' trial was reduced to 81.

6. Each count referred to one income tax return.

with respect to refund checks payable to Lopez.

Count 78 charged appellant Cooper and defendant Tendrich with a similar violation in connection with a refund check payable to Tendrich.

3. The eighteen counts dismissed by the trial judge as to all defendants charged violations of 18 U.S.C. § 1001 in connection with the conduct involved in 2., supra. The court ruled that the presentation of an endorsed refund check did not involve the use of a "trick, scheme or device" to "falsify, conceal, or cover up" a material fact within the meaning of the statute.

4. Three counts charged certain defendants with making statements on their income tax returns as to payment of estimated tax which they knew to be false:

Count 75 charged appellant Moore with respect to his 1959 return.

Counts 76 and 77 charged appellant Lopez with respect to the 1960 and 1961 joint returns of Lopez and his wife.

5. Two counts charged certain defendants with concealing, removing, mutilating, obliterating and destroying Taxpayer Delinquent Account records in violation of 18 U.S.C. § 2071(a):

Count 73 charged appellants Cooper, Lacey and Lopez with respect to the records of Lopez and his wife. The trial court dismissed this count as to Lopez.

Count 74 charged appellant Cooper and defendant Wood in connection with Cooper's records.

6. Count 68 charged appellant Cooper with impersonating an officer and employee of the United States. The jury acquitted on this count.

## THE GOVERNMENT'S EVIDENCE

The presentation of the government's case consumed five weeks, and nearly five thousand pages of the trial transcript are devoted to the testimony concerning this part of the case. The following summary is intended to contain only such detail as is necessary for an understanding of the issues presented on this appeal; some relevant evidence is therefore either omitted or described very generally.

The government's chief witness was Ethel Ivy Neely, who had pleaded guilty to the conspiracy count prior to trial. Mrs. Neely had been a supervisor in the Math Verification Group at the Manhattan District office of the Internal Revenue Service. Her testimony disclosed a series of schemes by which payments of taxes were avoided and unlawful refunds obtained. In addition to Neely, the principal malefactors were appellants Grover Cooper and John L. Lacey, also Internal Revenue Service employees, who acted as intermediaries between Neely and persons seeking to avoid payment of taxes or to obtain unlawful refunds.

Neely testified that in 1955 and early 1956 Cooper induced her to process about twenty-five returns so as to avoid audit. Neely accomplished this by marking the returns with symbols indicating that the returns had been examined prior to coming into her unit and had been found not to require audit. She then placed the returns with the other work sent out of her unit for further processing. In March or April of 1956 Cooper informed Neely that he needed money and asked her to prepare and process a fictitious refund return. When she refused, Cooper told her that the returns he had previously given her were fraudulent and threatened to report her. Neely yielded and prepared a fictitious return using her own address and the name of a relative. When the refund check arrived, she turned it over to Cooper. Between 1956 and 1961 Neely prepared and processed several fictitious returns at Cooper's request. On one occasion Cooper stated that he needed money because he was in the policy business with appellant Charles Moore.

### The Branker Refund Checks

In November, 1958, Cooper persuaded Neely to process so as to avoid audit a 1957 income tax return of Percy Branker calling for a refund of about $2,200. A few months later Cooper asked her to

process another 1957 return for Branker. When Neely asked why Branker was filing two returns for the same year, Cooper stated that he and Branker had "worked out a scheme." Because Branker, who owned a bar, was able to cash large checks, they could obtain substantial sums by submitting fraudulent returns calling for large refunds.

From 1958 to 1962, Neely processed approximately twelve returns with Branker's name on them. On each occasion, Cooper would tell Neely the amount of money "he and Branker wanted," and she would fill out and process a return. Refunds totalling more than $80,000 were obtained in this way. After each refund check was issued, Neely ordinarily removed the corresponding return from the files and gave it to Cooper. On some occasions Cooper sent defendant Frank McClary to pick up the returns.

The testimony of other witnesses was introduced to show (1) that most of the returns were missing from the files and (2) that the refund checks were deposited in bank accounts belonging to Branker. Also introduced were portions of Branker's Grand Jury testimony in which he admitted receiving and endorsing the refund checks which he knew did not represent amounts owed to him.

### The McTootle and Tendrich Refund Checks

Defendant Herman McTootle, who testified for the government, stated that a tax deficiency of $116,675.23 had been assessed against him in 1959 as a consequence of a raid on his wagering business. He described his tax problems to appellant David Lopez who replied that he knew a man who had gotten him "off the hook." Lopez then arranged for McTootle to meet Cooper. Cooper agreed to take care of the problem for twenty-five percent of the amount assessed. McTootle paid Cooper a total of $8000 over a period of time. By Thanksgiving, 1960, McTootle's funds were exhausted. Cooper, however, continued to press him for payment; on several occasions he visited McTootle's Long Island barber shop seeking money. On two such visits Cooper was accompanied by appellant John Lacey and on one by defendant McClary.

Finally, in May or June of 1961, Cooper told McTootle that he had "another angle." He would obtain refund checks payable to McTootle, the proceeds of which could be used to reduce McTootle's tax liability. In December, 1961 Cooper met Neely and told her that he was going to work the same refund scheme with McTootle that he had worked with Branker. Neely prepared a return calling for a $9,334.41 refund. When McTootle received the check, he cashed it and turned over the proceeds to a Miss Shirley King pursuant to Cooper's instructions.

About one month later Cooper asked Neely to prepare a return in the name of Irving Tendrich calling for a $9,300 refund. Since the McTootle refund was in about the same amount, Neely simply removed the McTootle return from the files, changed the name and the account number and sent it out of her unit to be processed again.

In succeeding months two more refund checks in McTootle's name were obtained and disposed of in the same manner as the first, except that McTootle retained $500 of the proceeds of the third refund check. None of the proceeds which McTootle turned over to Miss King were in fact used to reduce his indebtedness to the government.

### The Moore Returns

In November, 1956 Cooper told Neely that appellant Charles Moore owed a lot of money in taxes and that he, Lacey and defendant Catherine Wood were removing Moore's taxpayer delinquent accounts and planned to destroy them. He then asked Neely to process as fully paid returns the balance due returns which Moore would be filing. Neely replied that she did not think that she could do so as she did not have access to the required remittance stamp. In October, 1957 Cooper gave her Moore's 1956 return, but Neely refused to process it

since it bore no remittance stamp. The next day Cooper gave her the return stamped. Neely then marked the return so as to make it appear that it was fully paid and sent it out of her unit for further processing. Later Neely processed Moore's 1958, 1959 and 1960 balance due returns as fully paid. Neely testified in considerable detail about the special precautions she took in processing the 1959 return so that it would escape scrutiny in a newly instituted validation program.

An Internal Revenue Service employee testified that a search of the records did not disclose the estimated tax payment claimed by Moore on his 1959 return.

### The Lacey Returns

In March, 1958 Lacey met Neely and told her that he had prepared a large number of returns for taxpayers claiming deductions and exemptions "which were not true to form." He added that these taxpayers had paid him to prepare and process the returns to avoid audit and that Cooper had told him that she was able to do this. When Neely replied that she did not handle such returns, Lacey answered that he knew she had been processing such returns for Charles Moore. Neely thereupon agreed to process returns for Lacey. Lacey gave her about 25 returns in 1958 and about 200 returns in each year from 1959 to 1962. At trial Neely identified each of the nineteen returns mentioned in the indictments.

### The Ross Returns

In May, 1960 Lacey called Neely and asked her to meet him at Grand Central Station. When she arrived, Lacey introduced her to appellant John Ross, Jr., as one who could see to it that a return would avoid audit. Ross said "you're just the girl I am looking for." After Lacey left, Ross gave Neely twenty-five returns to process. He assured Neely that he would take care of her handsomely. Then Ross, a lawyer, gave her his business card on which his telephone number was written in case she needed to get in touch with him.

From 1960 through 1962 Ross met Neely about a dozen times and gave her a total of about fifty to seventy-five returns. Neely testified in detail about her meetings with Ross and the procedures she followed in connection with the seventeen returns specified in the indictments.

### The Transfer of Funds to Moore's Estimated Tax Account

Neely testified that in November, 1958 Lacey instructed her to have defendant Laurel Bayley transfer funds in another taxpayer's account to Moore's Estimated Tax Account. Thereafter, she and Bayley carried out these instructions.

### The Transfer of the Lopez Taxpayer Delinquent Account

Neely testified that Cooper told her in November, 1959 that he was attempting to have Lopez's Taxpayer Delinquent Accounts transferred from the Newark office to Manhattan so that he and Lacey could destroy them.

A Transfer Clerk in the Newark office testified that she recalled three attempts to transfer the Lopez accounts in the fall of 1959 and the early part of 1960, the last of which was successful. She testified as to various irregularities and unusual circumstances surrounding these attempts.

Although Neely was only tangentially involved in the attempts to transfer, she was able to give testimony implicating both Lacey and Cooper. In November, 1959 Cooper asked Neely to contact the Transfer Clerk and ask her to let her know when the Lopez Account was received. Neely refused on the ground that she did not know the Transfer Clerk well enough. Cooper said he would discuss it with Lacey. One week later, Lacey approached Neely and made the same request, but added "tell her [the Transfer Clerk] you are handling the transfer for me, she has handled transfers for me before." Having thus linked Lacey with Cooper, Neely gave testimony which, if believed, conclusively established Cooper's guilt. The most

damaging testimony indicated that early in March, 1960 Cooper showed Neely Lopez's Taxpayer Delinquent Accounts. Several days later, Cooper told her that the accounts had been destroyed.

*The Lopez Returns*

In April, 1961 Cooper gave Neely the 1960 return of Lopez and his wife and told her that the estimated tax claimed on the return had not been paid. He asked her to make sure that the return was not audited, and Neely complied with his request. One year later, the same sequence of events took place with respect to the Lopez's 1961 return.

An Internal Revenue Service employee testified that a search of the files disclosed no record of the estimated tax payments claimed on the returns.

Lopez admitted endorsing the refund checks which he received as a result of the substantial estimated tax payments claimed on the returns.

*The Cooper Taxpayer Delinquent Account*

In April, 1962 Cooper gave Neely his own 1961 return and asked Neely to process it as fully paid. Neely did not do so, and Cooper was billed for his taxes. He became angry with Neely but told her that he didn't care because he would have Catherine Wood destroy his Taxpayer Delinquent Account. Three months after Cooper's arrest, Wood went to her supervisors and admitted destroying Cooper's account.[7]

### THE JOINT TRIAL

Appellants have at all stages complained that their joinder was prejudicial. Although appellants Moore and Lopez continue to maintain that denial of their pre-trial motions for severance was error, appellants' most vigorous objections are directed at the denial of the motions for severance or separate trials made following the dismissal of the conspiracy count at the close of the government's case.

In United States v. Aiken, 373 F.2d 294 (2d Cir.), cert. denied, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967) this court said:

"Where joinder was originally proper under Fed.R.Crim.P. 8(b), * * * a motion for severance after the count justifying joinder (here the conspiracy count) is dismissed will not be granted unless the defendant was prejudiced by the joinder or the count dismissed was not alleged by the government in good faith, that is, with reasonable expectation that sufficient proof would be forthcoming at trial." 373 F.2d at 299. See Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921(1960).

We do not believe that appellants Cooper and Lacey, who had central roles in most of the schemes charged in the indictments were prejudiced by the joinder. However, we hold that appellants Branker, Lopez, Moore, and Ross should have been granted separate trials.

Originally twelve defendants and six co-conspirators were named in eighty-four counts. The eight defendants who were tried were named in eighty substantive counts charging violation of six criminal statutes. While it is true that this court has on several occasions sustained convictions on substantive counts after dismissal of a conspiracy count relied upon to justify joinder, see, e. g., United States v. Schaffer, 266 F.2d 435 (2d Cir. 1959), aff'd Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L. Ed.2d 921 (1960); United States v. Elgisser, 334 F.2d 103 (2d Cir.), cert. denied, Gladstein v. United States, 379 U. S. 879, 85 S.Ct. 148, 13 L.Ed.2d 86; 379 U.S. 881, 85 S.Ct. 151, 13 L.Ed.2d 87 (1964), we are not aware of any such case in which the number of counts even approached the number involved here. It is obvious that as the number of counts is increased, the record becomes more complex and it is more difficult

---

7. At trial, Wood testified in her own behalf and denied destroying the account. She explained her pre-trial statements to the contrary on grounds of illness and duress.

for a juror to keep the various charges against the several defendants and the testimony as to each of them separate in his mind. See United States v. Bufalino, 285 F.2d 408, 417 (2d Cir. 1960). See also Kotteakos v. United States, 328 U.S. 750, 766–767, 66 S.Ct. 1239, 90 L. Ed. 1557 (1946).

This kind of prejudice is particularly injurious to defendants who are charged in only a few of the many counts, who are involved in only a small proportion of the evidence, and who are linked with only one or two of their co-defendants. The jury is subjected to weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve these defendants in any way. As trial days go by, "the mounting proof of ,the guilt of one is likely to affect another." Schaffer v. United States, 362 U.S. 511, 523, 80 S.Ct. 945, 952 (1960) (Douglas, J., dissenting). See Blumenthal v. United States, 332 U.S. 539, 559–560, 68 S. Ct. 248, 92 L.Ed. 154 (1947); United States v. Kelly, 349 F.2d 720, 759 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). See also Kotteakos v. United States, 328 U.S. 750, 775–777, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Bentvena, 319 F.2d 916, 956 (2d Cir.), cert. denied sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

In the present case, the trial of the four taxpayer defendants was accompanied by a huge volume of testimony relating not to them but to the manifold criminal activities of Cooper, Lacey and Neely. Their own cases, in contrast, were simple ones which would have taken only a short time to try separately. Moore was named in three counts, two of which were submitted to the jury, and Lopez was named in seven counts, four of which went to the jury. While several counts named Ross and Branker, each was charged only with the repetition of one criminal act a number of times. Counsel for Moore and counsel for Branker estimate. that fewer than 150 pages of the nearly 7000 page transcript contain testimony relating to each of their clients.

The taxpayer defendants had very little connection with their co-defendants. Branker apparently was acquainted only with Cooper. Although he was introduced to her by Lacey, Ross dealt only with Neely. Moore dealt with Cooper and perhaps one or two others; even though he had been associated in business with Lopez, he was not linked to him criminally. Lopez was apparently involved only with Cooper and McTootle.

■ Apart from the prejudice inherent in any mass trial, a defendant in a trial in which the conspiracy count has been dismissed is likely to be prejudiced in defending the charges in the substantive counts by evidence, particularly hearsay testimony, which was admissible on the conspiracy count but which could not have been used against him in a separate trial on the substantive counts. One of the most dramatic of the many examples of this in the record before us is Cooper's statement to Neely that he needed money because he was in the policy business with Charles Moore.

■ Courts have recognized the grave danger of this kind of prejudice and have required "impregnable" safeguards to protect against it. See Blumenthal v. United States, 332 U.S. 539, 559–560, 68 S.Ct. 248, 92 L.Ed. 154 (1947). In the present case the trial judge instructed the jury to consider as to any defendant only (1) documentary evidence relating to that defendant, (2) testimony as to acts of that defendant and (3) conversations either with that defendant or in his presence. However, he permitted the hearsay statements of a co-defendant principal to be considered against a defendant charged with aiding and abetting on the question of whether the offense had been committed, though not on the question whether the defendant had aided and abetted. He made no attempt to itemize the evidence which had been stricken. The difficulty with this approach is that it leaves to the jury the task of mastering these ab-

stract principles and applying them to the vast amount of evidence introduced at trial. We accept the submission that the alternative of spending hours or even days telling the jury precisely what it is supposed to forget is not demonstrably superior to the method followed by the trial judge. In our view the risk of prejudice to the taxpayer defendants by reason of the joinder was so great that "no amount of cautionary instructions could have undone the harm." United States v. Kelly, 349 F.2d 720, 758 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). See United States v. Patrisso, 262 F.2d 194 (2d Cir. 1958).

It is regrettable that the trial court had to confront substantial motions for severances after five weeks of trial. Since the testimony of Mrs. Neely provided no surprises, counsel for the government must surely have known in advance of trial that the chances of proving the conspiracy charged in the indictment were very slim. Yet the conspiracy count provided the only justification for the joinder of the eight defendants. If the prejudice of joint trial is to be eliminated without the waste of time and energy which results from a joinder which is declared improper in the midst of trial, or, as here, on appeal, we must rely on the responsibility and good judgment of the prosecutors. See United States v. Agueci, 310 F.2d 817, 840–841, 99 A.L.R.2d 478 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963); Panel Discussion, The Problems of Long Criminal Trials, 34 F.R.D. 155, 158–161 (1963) (statement of Judge Weinfeld).

### OTHER POINTS

We turn now to the other points raised by appellants Cooper and Lacey.

Cooper challenges the adequacy of the court's instructions on the treatment of hearsay evidence, discussed above. We hold that, as to him, the instructions were sufficient.

Lacey [8] asserts that the court below erred in refusing to inspect the minutes of the Grand Jury which returned the indictment on which he was convicted. We find no error. The claim that the indictment was found without evidentiary basis is unsupported by the record.

Lacey also contends that there was insufficient evidence to justify his conviction on count 73. Viewed in the light most favorable to the government, United States v. Beltram, 388 F.2d 449 (2d Cir. 1968), we hold that the evidence is sufficient.

Branker argues that the presentation of a refund check for payment does not constitute the making of a false claim against the United States within the meaning of 18 U.S.C. § 287,[9] a point which, if sustained, would bar his retrial. We disagree. In Scolnick v. United States, 331 F.2d 598 (1st Cir. 1964), it was held that the indorsement and deposit for collection of a government check to which the depositor was not entitled constituted a false claim within the meaning of the civil false claims statute, 31 U.S.C. § 231. See also Dimmick v. United States, 116 F. 825 (9th Cir. 1902), cert. denied, 189 U.S. 509, 23 S.Ct. 850, 47 L.Ed. 923 (1903); United States v. Coggin, 3 F. 492 (E.D.Wis. 1880).

In view of our disposition of the appeals of Branker, Lopez, Moore, and Ross, we need not discuss the other points which they raise in their briefs.

The judgments of conviction of appellants Cooper and Lacey are affirmed;

8. Lopez and Ross raise similar points.

9. § 287. False, fictitious or fraudulent claims.
   Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

the judgments of conviction of appellants Branker, Lopez, Moore and Ross are reversed and the cases remanded for new trials.

RYAN, District Judge (concurring in part; dissenting in part):

I concur in the conclusion that appellants Cooper and Lacey were not prejudiced by the denial of severance and separate trial. I agree that their convictions should be affirmed.

I dissent from the conclusion reached setting aside the convictions of appellants Branker, Lopez, Moore and Ross. The convictions of all appellants should be affirmed. Guilt was established beyond doubt as to all the counts on which the jury returned verdicts of guilty. I find that no prejudice resulted to any appellant from the joint trial which was had. I find no basis in the record for a conclusion as to these four appellants different from that reached as to appellants Cooper and Lacey.

The Court notes that "counsel for the government must surely have known in advance of trial that the chances of proving the conspiracy charged in the indictment were very slim," and the exercise of "good judgment" should have led the Government to have moved prior to trial to dismiss Count 1 of the indictment; with this, I agree. I do not agree, however, with the further statement that "* * * the conspiracy count provided the only justification for the joinder of the eight defendants."

It is plain that the central roles of the conspiracy, operating within the office of the Internal Revenue Service, were played by Cooper, Neely and Lacey but, as the activities of these three expanded to embrace the returns of Moore, Branker, Lopez and the returns handled for Ross, each one of these four became willing and active collaborators in so far as the respective returns in which they were interested were involved. The concise résumé of the evidence in the prevailing opinion details how in turn each one of them joined with the Cooper-Neely-Lacey combination as it undertook further to swindle the Government.

The Court apparently finds prejudice per se with respect to four of the defendants in the fact of the joint trial. The prejudice is said to flow from the length of the trial and the volume of testimony not relating to these four defendants, and from the jury's lack of capacity to deal with abstract principles of law expounded by the trial judge. From this generalization, the Court seems to be satisfied that the risk of prejudice was so great that no amount of cautionary instructions could undo the harm.

While it is true that the four taxpayer defendants had very little connection among themselves, Neely was the common center to the fraudulent processing of all the returns. She was the "hub" about which all revolved. It would have been proper, therefore (even without the conspiracy count), to have joined all these four defendants in one indictment (Rule 8(a) and (b), F.R.Cr.P.).

I read nothing abstract for the jury to master in the trial judge's instructions. They were precise and factual, and were separately stated as to each defendant.

I do not argue with the Court's statement that, as the number of counts increases or as a trial record becomes complex, it may become more difficult for a juror to keep separate the various charges against the several defendants and the testimony as to each of them. But prejudice must be established as to each defendant, before the jury's finding of guilt as to a particular defendant may be overturned on appeal.

Although *Kotteakos*, 328 U.S. 750, 66 S.Ct. 1239 speaks of the abstract right of defendants not to be tried *en masse,* the Court there looked at the particular circumstances of the case, at the evidence and at the erroneous charge, and concluded on the basis of all this that it was "highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." (p. 776, 66 S.Ct., p. 1253). The same cannot be said to be the case here.

Aside from the volume of evidence, the record discloses that the proof against each of these four defendants was simple, direct and brief, resting as it did on Neely's veracity and that of other Government witnesses and on undisputed documents, as well as on defendants' own admissions.

Much may be written of evils which come from many-count, multi-defendant indictments. They should be avoided whenever consistent with fairness to the defendant and to the Government. We must not, however, lose sight of the problems which come from requiring the repeated testimony of an accomplice and conspirator, who is called upon to testify at a succession of trials. Separate trials as of right for defendants jointly indicted, is no longer the rule. The prevailing opinion agrees it was not required as to two of the appellants—Cooper and Lacey; failure to grant it to the other appellants is not ground for reversal.