**UNITED STATES of America, Appellee,**

v.

**Peter VARIANO et al.,
Defendants-Appellants.**

**Nos. 431, 364, 418, 432, 472 and 473,
Dockets 76–1335, 76–1358, 76–1359,
76–1360, 76–1354 and 76–1442.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 29, 1976.

Decided March 14, 1977.

Irving Anolik, New York City, for defendant-appellant Variano.

Jerald Rosenthal, New York City (Irving Katcher, New York City, of counsel), for defendant-appellant Bucci.

B. Alan Seidler, New York City, for defendant-appellant Russillo.

Edward S. Panzer, New York City (Julia P. Heit, New York City, of counsel), for defendant-appellant DeMichaels.

Armende Lesser, New York City, for defendant-appellant Monaco.

Harold W. Dublirer, New York City (Paul A. Victor, New York City, of counsel), for defendant-appellant Evangelista.

Before MOORE, ANDERSON and FEINBERG, Circuit Judges.

MOORE, Circuit Judge:

Peter Variano, Henry Bucci, Anthony Russillo, Michael DeMichaels, John Monaco and Michael Evangelista appeal from judgments convicting them of conducting an illegal gambling business in violation of 18 U.S.C. § 1955.

Appellants and seven other defendants were initially charged in a two-count indictment, dated April 14, 1976, with conducting an illegal gambling business in violation of 18 U.S.C. § 1955 (Count II) ("the substantive count") and with conspiring to conduct an illegal gambling business in violation of 18 U.S.C. § 371 (Count I) ("the conspiracy count"). On April 26, 1976, an evidentiary hearing was held before Judge Carter of the Southern District of New York, to resolve various motions to suppress made by several of the defendants. Judge Carter denied all of the motions. On April 27, appellant Evangelista and three of the other defendants pleaded guilty to the substantive count of the indictment. Evangelista reserved his right to appeal the denial of his motion to suppress.

The trial before Judge Carter and a jury commenced on that same day. At the close of the Government's case, Judge Carter dismissed the conspiracy count on the ground that there was a variance between the

Michael D. Abzug, Special Atty., Dept. of Justice, New York City (Robert B. Fiske, Jr., U. S. Atty. for the S. D. N. Y., Audrey Strauss, Asst. U. S. Atty., New York City, of counsel), for appellee.

Government's theory and its proof: the Government's evidence made out a case of multiple conspiracies, rather than the single conspiracy alleged in the indictment. The defendants had also moved to dismiss the substantive count, and they now asserted that this dismissal was required by Judge Carter's dismissal of the conspiracy count. Judge Carter denied the motion.

None of the defendants offered any evidence. The substantive count went to the jury. On May 6 the jury returned guilty verdicts as to appellants Variano, Bucci, Russillo, DeMichaels, and Monaco, and one of the other defendants. Judge Carter entered judgments of conviction as to Evangelista on June 8, and as to the other five appellants on July 8.

Each of the appellants raises several issues on appeal—the "spillover" of evidence from the dismissed conspiracy count to the remaining substantive count, a variance in the proof as to the substantive count, insufficiency of the evidence as to certain of the appellants, prejudice resulting from a Government witness' invocation of the Fifth Amendment and his citation for contempt in front of the jury, an illegal search and seizure, improprieties in wiretap procedure, and prejudicial remarks by a Government witness and by the prosecutor.

We have considered each of the issues raised very carefully and discuss several of them below. We find all of the issues to be without merit and we affirm the convictions.

## FACTS

The Government's evidence established the existence of numbers, sports and horse gambling operations in the Bronx and Westchester beginning in 1968 and continuing until 1975. The cast of characters varied, but the pyramidal set-up remained essentially the same: Customers placed their bets with "runners" in the local candy store, soda shop, or bar. "Pick up" men collected the wagers for the runners and brought them into the "bank"—the nerve center of the operation. The wagers were in envelopes bearing the runner's code on the outside. Each runner was referred to as an "account". At the bank, the wagers were tallied and when the results of the numbers, sports or horse events in question came in, the "hits" were also tallied. A "tape" was then made recording each account's total tally of wagers and hits. The bank determined how much money each account owed its customers, and placed this amount in an envelope. The envelopes were delivered to the individual runners who then paid off their winning customers, after deducting their own commissions.

Michael Yannicelli[1] was the "bank" of the operation here in question from 1968 until 1972. Michael Calise[2] testified that he worked as a "runner" and as a "pick-up man" for the operation during this period. He stated that appellant DeMichaels was one of Yannicelli's accounts. DeMichaels was what was known as a "half-sheet dealer." Rather than taking bets from customers himself, he had several runners working for him. In each week that he came out ahead—i. e., the wagers placed with his runners were greater than his customers' hits—he split his profits with Yannicelli. Conversely, when hits exceeded wagers, Yannicelli paid the customers and recovered the amount paid from DeMichaels the next time he came out ahead. Calise stated that Francis J. Millow[3] was one of DeMichaels' runners.

The evidence showed that DeMichaels and Millow continued collecting wagers af-

1. Yanicelli pleaded guilty to both counts of the indictment on April 27, 1976. He has not appealed.

2. Michael Calise was initially indicted for the crimes of promoting gambling in the first degree and possession of gambling records in the first degree. He then jumped bail but was later apprehended. He agreed to cooperate with the Government after being permitted to plead guilty to a misdemeanor and receiving a suspended sentence.

3. Millow is an unindicted co-conspirator who was granted immunity by the Government and was subpoenaed to testify at appellants' trial.

ter 1972, but that in this later period, their accounts were with appellant Variano, rather than with Yannicelli. Variano's operation was broader than Yannicelli's—it encompassed gambling on football games, as well as on numbers and horses. Variano's one-time girlfriend, Angelina David, testified that, at Variano's request, she did the bookkeeping for the football end of the operation. David stated that she accompanied Variano to various motels where he met his pick-up men and collected their wagers and money. Each Saturday Variano gave David bags containing the money and wagers. David tallied the wagers and delivered her computations to Variano. Variano received the results of the football games on Sunday night and he and appellant Bucci then determined which bettors, if any, had made "hits". They made a master tape of each account's wagers and hits and delivered envelopes to each account containing the money it owed its bettors.

There was evidence that Millow, and appellants Bucci, Russillo and DeMichaels all had accounts with Variano. The "pick-up" network appears to have been slightly more complicated than the one during the earlier "Yannicelli" period. Bucci, Russillo and DeMichaels apparently delivered some of their wagers to Millow, who in turn phoned them to appellant Evangelista.[4] Evangelista placed the wagers on coded slips of paper and gave them to several people, including appellant Monaco. The Government's evidence establishing this network included gambling records and paraphernalia seized from various of the appellants, physical surveillance of their comings and goings, and electronic surveillance of their telephone conversations.

At the close of the Government's case, Judge Carter determined that at least two, and possibly three, distinct time frames had been set forth. He concluded that the Government had made out a case of multiple conspiracies, rather than the single conspiracy alleged in the indictment. On the ground of this variance between the Government's theory and its proof, Judge Carter dismissed the conspiracy count.

## DISMISSAL OF THE CONSPIRACY COUNT

After Judge Carter dismissed the conspiracy count, appellants moved that he also dismiss the substantive count on two grounds: (1) the Government was collaterally estopped from proving the substantive count once the similar conspiracy count had been dismissed; and (2) there was a prejudicial "spillover" of evidence admitted solely because of the conspiracy count. Judge Carter refused to dismiss the substantive count. With this refusal we agree.

■ Little need be said regarding the first prong of appellants' argument—collateral estoppel. Variano and DeMichaels contend that since the substantive statute, 18 U.S.C. § 1955,[5] requires the participation of "five or more persons", it requires conspiratorial conduct, and thus once Judge Carter had determined that there was no single conspiracy, the Government was collaterally estopped from proving a violation of the substantive statute.

The doctrine of collateral estoppel does not apply to the facts of this case. Judge Carter did not find that there was no conspiracy; he found that there was no *single*

---

4. Theresa Belardo testified that Evangelista paid her in order to use her telephone for incoming calls during set hours each day.

5. 18 U.S.C. § 1955 provides in part as follows:
    (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
    (b) As used in this section—
    (1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;
(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $20,000 in any single day.
    *    *    *    *    *    *

conspiracy. He found one conspiracy in existence during the period from 1968 to 1972, and at least one other, distinct conspiracy in the period from 1973 to 1974. In this later period Judge Carter named two groups of five persons the evidence linked to one another: Variano, Colletti, Bucci, Russillo and Millow; and Picciano, Ostrander, Monaco, Evangelista and Murty.[6] As to the earlier period, Judge Carter named only Centore and DeMichaels, but stated that it was his recollection that "a larger number of people" were involved. We would add to Judge Carter's recollection the names Calise, Yannicelli, and Millow. Thus, when Judge Carter's dismissal of the conspiracy count is analyzed, it becomes clear that it had no collateral estoppel effect whatsoever on the remaining substantive count of the indictment.

█ The second prong of appellants' argument for dismissal of the substantive count is that the dismissal of the conspiracy count removed the only reason for the prejudicial joinder of the defendants. Moreover, evidence which had been admitted solely on the ground of the conspiracy count had a "spillover effect" on the remaining substantive count. The law in this Circuit is clear. Appellants can only succeed in this argument if they show bad faith on the part of the Government in bringing the conspiracy charge, or if they show prejudice. *United States v. Aiken,* 373 F.2d 294 (2d Cir. 1967). *See also, United States v. Bentvena,* 319 F.2d 916 (2d Cir.), *cert. denied,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); *United States v. Branker,* 395 F.2d 881 (2d Cir. 1968), *cert. denied,* 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969); *United States v. Miley,* 513 F.2d 1191 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975); and *United States v. Ong,* 541 F.2d 331 (2d Cir. 1976).

█ Only one appellant, Bucci, alleges bad faith on the part of the Government. He states conclusorily that the Government's sole purpose in bringing the conspir-

acy charge was to "inundate the jury with the weight of governmental activities, state and federal; spiced with violence and corruption in a mass trial." (Bucci Brief at 14.) What Bucci ignores is that the Government had good reason to believe that its conspiracy charge would be supported by its evidence at trial. The Government was counting on Millow's testimony to tie together the two time frames found by Judge Carter. Millow had been granted immunity, and thus the Government was genuinely surprised when he refused to testify. The Government's good faith in this case is evident.

Appellants' allegations of prejudice cause us more hesitation. This Court, in the past, has looked at several factors, including the number of substantive counts, the number of defendants, the length of the trial, the extent of the permissible evidence against each defendant, and the extent of the judge's cautioning instructions to the jury. Thus in *United States v. Branker, supra,* the Court found prejudice as to three of the eight defendants, who were charged in only a few of the 80 counts, and whose names appeared in only a very small part of the transcript of the five-week trial.

Here, on the other hand, the trial lasted only eight days and involved only one substantive count. The only testimony which was admissible solely on account of the conspiracy was a portion of Calise's testimony on the first day of trial. Judge Carter continually instructed the jury against use of this testimony, and the jury's questions and its split verdict evidenced an understanding of these instructions. In sum, we find no prejudice resulting to defendants from their joinder at trial.

## MILLOW'S INVOCATION OF THE FIFTH AMENDMENT

█ We also find no prejudice resulting to any of the defendants from Millow's invocation of the Fifth Amendment and

---

**6.** Murty pleaded guilty to Count II and the jury found Picciano guilty of Count II. Neither has appealed. The jury found Ostrander not guilty.

citation for contempt by Judge Carter in front of the jury. Millow had been granted immunity, and the Government had no reason to suspect that he would refuse to testify when he took the stand—the Government could not conduct a dress rehearsal.

Judge Carter handled the unfortunate situation reasonably. Immediately after Millow asserted his Fifth Amendment privilege, Judge Carter excused the jury and explained to Millow that he was required to testify under his grant of immunity. Judge Carter then recalled the jury and directed the Government to ask Millow the same question he had previously refused to answer.[7] When Millow said that he needed the assistance of his attorney because he was afraid of perjuring himself, Judge Carter cited him in contempt.

Appellants' allegation of prejudice from this incident—that the jury was left with the impression that Millow's silence was caused by his fear of appellants—is highly speculative. Moreover, it appears to be an afterthought as none of the appellants requested a curative instruction at the trial.

### SEARCH OF MONACO'S CAR

■ Monaco moved to suppress the introduction of gambling records seized from his car under the following circumstances: On September 3, 1974, Officer James Trotta of the Yonkers Police Department observed Monaco driving in a car with a cracked windshield. Knowing, in addition, from a prior incident, that Monaco did not have a valid driver's license, Trotta caused Monaco to stop. After confirming that Monaco had no license, Trotta informed him that he would be issued a summons and that his car would be impounded. Trotta then entered Monaco's car to drive it to police headquar-

ters for impoundment. As he pulled away from the curb, the gambling records in question fell from the sun visor.

Monaco has not contested this version of the facts as testified to by Officer Trotta, and on these facts, the seizure was clearly legal. Once Trotta learned that Monaco did not have a license, it was not "unwarranted either in terms of state law or sound police procedure", *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2530–2531, 37 L.Ed.2d 706 (1973), for him to move the car off the street himself. Moreover, Trotta's entry into the car was a proper incident to Monaco's impending arrest. The lawfulness of his seizure of the gambling records which thereupon came into plain view is beyond question. *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States ex rel. LaBelle v. LaVallee,* 517 F.2d 750, 755 (2d Cir. 1975), *cert. denied,* 423 U.S. 1062, 96 S.Ct. 803, 46 L.Ed.2d 655 (1976).

### THE WIRETAP EVIDENCE

■ Evangelista moved to suppress tapes of telephone conversations to which he was a party on the ground that he received no post-termination notice, in violation of N.Y. Crim.Proc.L. § 700.50(3).[8]

On November 8, 1976, Westchester County Judge Richard Daronco issued a wiretap order on the phone of Anthony J. Millow. Among the conversations subsequently intercepted on this phone were several between Francis Millow and appellant Evangelista. Fourteen days after the termination of a renewal order for the wiretap on Millow's phone, Judge Daronco directed the issuance of notice to sixteen persons. Evangelista was not one of the sixteen. The Government's explanation is that

---

**7.** Millow had already answered five questions about his personal background. He asserted his Fifth Amendment privilege when he was asked whether he knew appellant Bucci. When Millow refused to answer this question, the Government refrained from asking him any further questions.

**8.** N.Y.Crim.Proc.L. § 700.50(3) provides, in pertinent part, as follows:

"Within a reasonable time, but in no case later than ninety days after termination of an eavesdropping warrant . . . written notice . . . must be personally served upon the person named in the warrant and such other parties to the intercepted communications as the justice may determine in his discretion is in the interest of justice."

Evangelista's voice was not identified on the tapes.

Since Evangelista was not named in the wiretap warrant, his right to receive post-termination notice was in the discretion of Judge Daronco. If, in fact, Evangelista's voice was not identified after reasonable efforts, then the failure to give him notice was clearly not an abuse of discretion.

Moreover, even if, as Evangelista contends, the Government should have recognized his voice on the tapes in question,[9] the failure to give him notice does not require suppression of the tapes. We held in *United States v. Principie,* 531 F.2d 1132 (2d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977), that the defendant must show prejudice before a motion to suppress will be granted on the ground of a failure to give post-termination notice, in violation of N.Y.Crim.Proc.L. § 700.50(3) and 18 U.S.C. § 2518(8)(d). This point, which was in dispute among the circuits, was resolved by the Supreme Court in *United States v. Donovan,* —— U.S. ——, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Reversing a Sixth Circuit holding that the failure to give notice, even absent a showing of prejudice, mandated suppression, the Court stated:

> "Nothing in the structure of the Act [Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520] or this legislative history suggests that incriminating conversations are 'unlawfully intercepted' [and thus required to be suppressed under 18 U.S.C. § 2518(10)(a)] whenever parties to those conversations do not receive discretionary inventory notice as a result of the Government's failure to inform the District Court of their identities. . . . The fact that discretionary notice reached 39 rather than 41 identifiable persons does not in itself mean that the conversations were unlawfully intercepted.[26]

> [26] * * *

> "Moreover, respondents Merlo and Lauer were not prejudiced by their failure to receive postintercept notice . . . . [T]he Government made available to all defendants the intercept orders, applications, and related papers. . . . And in response to pretrial discovery motions, the Government produced transcripts of the intercepted conversations."

—— U.S. at ——, 97 S.Ct. at 673–674.

\* \* \* \* \* \*

Evangelista, similarly, was not prejudiced by the failure to provide him with notice. Six weeks before the trial, the Government provided Evangelista with all of the orders, applications and other papers relating to the wiretaps in question, and in addition, made duplicate tape recordings available for his inspection. Thus under these circumstances, in the absence of any showing of prejudice, Judge Carter's denial of Evangelista's motion to suppress was correct.[10]

Convictions affirmed.

---

**9.** Evangelista notes that he was under physical surveillance during the period of the wiretap and that at the moment of his arrest on December 31, 1974, he was on the phone and being recorded.

**10.** Evangelista argues that the New York wiretap statute involved here, N.Y.Crim.Proc.L. § 700.50(3), is more restrictive than the federal statute involved in *Donovan,* 18 U.S.C. § 2518(d), and that the New York statute mandates suppression, even absent a showing of prejudice. We rejected this interpretation of the New York statute in *Principie,* 531 F.2d at 1142, n. 12 and reject it again here. *People v. Brenes,* 23 A.D.2d 78, 385 N.Y.S.2d 530 (1st Dept., 1976), cited by Evangelista, holds merely that suppression is mandated in the case of a "blatant violation" by the police of the minimization requirements of the New York statute. In that case, the police had used an automatic device which "tapped and taped every single telephone conversation in full, including those concededly non-pertinent." 385 N.Y.S.2d at 532. Such a violation is a far greater interference with the "congressional intention to limit the use of intercept procedures", *United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974) than is the failure to give post-termination notice.