**UNITED STATES of America,**

v.

**Joseph R. PISANI and Kathryn Godfrey, Defendants.**

**No. SS 83 Cr. 750 (DNE).**

United States District Court, S.D. New York.

April 18, 1984.

Rudolph W. Giuliani, U.S. Atty., New York City, for the United States of America; Charles G. LaBella and Michael S. Feld-

**1332**

berg, Asst. U.S. Attys., New York City, of counsel.

Robert Kasanof and Mary Shannon, New York City, for defendant Joseph Pisani.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for defendant Kathryn Godfrey; Alan Levine, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

EDELSTEIN, District Judge:

Indictment SS 83 Cr. 750 (DNE) was filed on March 8, 1984 and comprises 39 counts. This indictment superceded two earlier indictments, 83 Cr. 750 filed on December 1, 1983 and S 83 Cr. 750 filed on February 9, 1984.

Count 1 charges defendant Pisani with conspiring to defraud by use of the mails the Temporary State Commission on Child Welfare ("TSCCW"), by hiring Joseph Mallon, who would do no work for the TSCCW, in exchange for the sale of Mallon's summer house to Pisani and Godfrey. 18 U.S.C. § 371. Counts 2 through 4 charge defendant Pisani with defrauding the TSCCW in connection with this scheme. 18 U.S.C. § 1341.

Counts 5 through 10 relate to the cover up of the conspiracy and fraud charged in counts 1 to 4. Count 5 charges Pisani with conspiracy to commit perjury and obstruct justice. 18 U.S.C. § 371. Counts 6 and 7 charge Godfrey with perjury and Pisani with having aided and abetted her perjury. 18 U.S.C. §§ 1623 and 2. Count 8 charges Godfrey and Pisani with obstruction of justice in connection with Godfrey's Federal Grand Jury appearances. 18 U.S.C. § 1503. Count 9 charges Pisani with subornation of perjury. 18 U.S.C. § 1622. Count 10 charges Pisani with obstruction of justice. 18 U.S.C. § 1503.

Counts 11 through 26 charge Pisani with defrauding by use of the mails several of his campaign funds, his campaign contributors, the New York State Board of Elections, and those who reviewed allegedly fraudulent financial disclosure statements

submitted by Pisani by diverting money from his campaign funds for his personal use and concealing that diversion through the filing of false financial disclosure statements. 18 U.S.C. § 1341.

Counts 27 through 31 charge Pisani with defrauding by use of the mails a law partnership of which he was at different times a member and "of counsel" and clients of that firm, by concealing from the firm fees paid to him and by diverting funds from the client escrow accounts. 18 U.S.C. § 1341.

Counts 32 through 35 charge Pisani with tax evasion for the years 1978 through 1981. 26 U.S.C. § 7201. Counts 36 through 39 charge Pisani with filing false income tax returns for those years. 26 U.S.C. § 7206(1).

Defendant Pisani's motions pending before this court are: (A) to dismiss all the mail fraud counts (counts 2 through 4, 11 through 26, and 27 through 31) on the grounds that they fail to state offenses against the United States and they fail to allege facts sufficient to constitute such offenses; (B) to dismiss the entire indictment on the grounds that (1) Fed.R.Crim.P. 6(g), which permits the extension of a grand jury beyond its initial 18 month term, and under which the grand jury that indicted Pisani was extended, is unconstitutional, or (2) Rule 6(g) as applied to the grand jury that indicted Pisani was an *ex post facto* application of a criminal law; (C) to compel the release of grand jury attendance records on the ground that no "reasonable assurance" exists that a majority of those grand jurors who indicted Pisani heard the essential evidence before voting to indict him; (D) to dismiss the conspiracies charged in counts 1 and 5 on the ground that they fail to allege "a plain and concise statement of the facts constituting the offense" and they include overt acts that occurred prior to the alleged conspiratorial period; and (E) to dismiss counts 1 through 11 of the indictment on the basis that the grounds raised by defendant God-

frey inured to Defendant Pisani's detriment.[1]

The motions by defendant Godfrey pending before this court are as follows: (1) to dismiss all the charges against Godfrey on the ground that the evidence upon which these charges were based included her "immunized" state grand jury testimony; (2) to dismiss the obstruction of justice charge, count 8, on the ground that the "same grand jury" that heard Godfrey's "immunized" testimony could not return an indictment charging her with obstruction of justice; and (3) to sever her trial from that of her codefendant, Pisani, or, in the alternative, to sever the counts involving both her and Pisani from the trial of the remainder of the counts against Pisani.[2]

## DISCUSSION

### A. *Pisani's Motion to Dismiss the Mail Fraud Counts*

■ Pisani's motion to dismiss the mail fraud counts on the ground that they do not plead an offense against the United States must be considered in light of the allegations in the indictment. If the indictment is sufficient on its face, that is, if it alleges each of the necessary elements of the offense charged, then it "is not subject to dismissal on the basis of factual questions, the resolution of which must await trial." *United States v. Black,* 291 F.Supp. 262, 264 (S.D.N.Y.1968).

### 1. *TSCCW Mail Fraud*

Counts 2 through 4 charge Pisani with mail fraud in connection with Pisani's placement of Joseph Mallon on the TSCCW payroll in exchange for the transfer of Mallon's summer house to Pisani and Godfrey. The indictment alleges that Pisani defrauded the State of New York and the TSCCW of money and the honest conduct of public business. Indictment, SS 83 Cr. 750 (DNE), at ¶¶ 7, 8 & 12. The indictment further alleges that Pisani agreed to place Joseph Mallon on the payroll for services that were not performed by Mallon in exchange for the sale by Joseph and Roberta Mallon of their house in Washingtonville, New York to Pisani and Godfrey. *Id.* at ¶¶ 9 & 12. The indictment further alleges that Pisani prepared false documents to conceal the diversion of funds. *Id.* at ¶¶ 11(h), (m), (*o*) & (t) & 12. The indictment also alleges mailings in furtherance of the fraud. *Id.* at ¶ 13.

■ Pisani contends that the mailings were not in furtherance of the scheme. One object of the scheme, as alleged, how-

---

1. The papers submitted on these motions are as follows:

Pisani's Notice of Motion to Dismiss, dated Jan. 27, 1984; Pisani's Memorandum of Law, dated Jan. 27, 1984; Pisani's Memorandum of Law, dated Jan. 27, 1984; Affirmation in Support of Motion to Dismiss, sworn to by Robert Kasanof Jan. 27, 1984; Pisani's Exhibits A Through F;

Government's Memorandum of Law in Opposition to Defendant Pisani's Pre-Trial Motions, dated Feb. 14, 1984 ("Government's Memo"); Affidavit of Charles G. LaBella, sworn to Feb. 14, 1984; Government's Exhibits 1 through 5;

Pisani's Notice of Motion to Dismiss, dated Feb. 21, 1984; Pisani's Memorandum of Law in Support of Motion to Dismiss Indictment;

Government's Memorandum of Law in Opposition to the Pretrial Motions of Defendants Pisani and Godfrey, dated March 9, 1984; Affidavit of Charles G. LaBella, sworn to March 9, 1984; Government Exhibits 1 Through 9;

Affirmation in Reply to Government's Response to Defendant Pisani's Motion to Dismiss, sworn to by Mary T. Shannon March 21, 1984.

2. The papers submitted on Godfrey's motions are as follows:

Godfrey's Notice of Motion, dated Feb. 21, 1984; Affidavit of Alan Levine sworn to Feb. 21, 1984; Defendant Godfrey's Memorandum of Law in Support of Her Motion to Dismiss the Indictment, dated Feb. 21, 1984; Exhibits 3522A through 3522J;

Government's Memorandum of Law in Opposition to the Pretrial Motions of Defendants Pisani and Godfrey, dated March 9, 1984 (submitted in answer to Pisani's motions also);

Godfrey's Notice of Motion, dated March 15, 1984; Affidavit of Alan Levine, sworn to March 14, 1984; Memorandum of Law in Support of Defendant Godfrey's Motion to Sever Pursuant to Rule 8(b), Fed.R.Crim.P., dated March 15, 1984;

Government's Memorandum in Opposition to Defendant Godfrey's Joinder Motion, dated March 27, 1984.

Defendant Godfrey's Reply Memorandum in Support of the Joinder Motion.

ever, was to have Mallon paid by the TSCCW. All the parties alleged to have participated in the deal would have known that the payments would be accomplished through the use of the mails, and, it is alleged, the payments were accomplished through the use of the mails. Under the Second Circuit decisions, these alleged mailings were sufficient to meet the statutory requirements. *See United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978) (dividing the money is part of the conspiracy); *United States v. Sindona*, 636 F.2d 792, 802 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981).

■ Pisani also contends that under this charge the government is attempting to regulate the work performance of state workers through the criminal law. Pisani's Memorandum of Law, at p. 15–16. This contention is frivolous. The indictment does not allege that Mallon was overpaid for services rendered or that his services were unsatisfactory. The indictment alleges that he was paid under Pisani's direction "for services that were not performed by him" in exchange for the sale that was for Pisani's benefit. These allegations do not call for an evaluation of work performance. They call for a judgment about fraud, plain and simple.[3]

Pisani's contention that the indictment lacks the requisite specificity under Fed.R. Crim.P. 7 is without merit. "We have 'consistently sustained indictments which tracked the language of the statute and, in addition, do little more than state time and place in approximate terms.' *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974)." *United States v. Bernstein*, 533 F.2d 775, 786 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). The indictment against Pisani not only specifies the approximate times and places of the transac-

tions underlying the fraud, it gives the amounts of the checks involved, the dates they were sent and to whom.

■ The indictment alleges all the elements of a mail fraud charge with specificity. Pisani's motion to dismiss counts 2 through 4 is therefore denied.

### 2. Campaign Fund Mail Fraud

Counts 11 through 26 charge Pisani with mail fraud in connection with various of Senator Pisani's campaign funds. These counts charge that Pisani and others conducted "a scheme ... to defraud and to obtain money ... from others ... to wit ... to divert ... at least $36,000 unlawfully from the Joseph R. Pisani Campaign Funds, to convert said funds to the personal use, ... and to conceal said diversion ...." Indictment SS 83 Cr. 750 (DNE), at ¶ 40. The indictment further alleges that those defrauded include: "those who contributed to the Joseph R. Pisani Campaign Funds, the New York State Board of Elections, and members of the public reviewing the Campaign Financial Disclosure Statements, including would-be contributors to the Joseph R. Pisani Campaign Funds ...." *Id.* at ¶ 47. The indictment further alleges that Pisani "entered or caused to be entered on the Campaign Financial Disclosure Satements ... false and fraudulent" entries in order to deceive those defrauded, and subsequently caused these statements "to be placed in post offices ... to be delivered ... to the New York State Board of Elections ...." *Id.* at ¶¶ 49–50. None of Pisani's attacks on these counts has any merit.

■ First, Pisani contends that no New York law restricts his use of campaign funds and that therefore he did not divert any money unlawfully. Even assuming arguendo these contentions are cor-

---

**3.** Even if Mallon performed the work for the TSCCW, the allegation that Pisani's action in hiring him was a quid pro quo for the transfer of his summer house would, with the other mail fraud elements alleged, support an indictment under 18 U.S.C. § 1341.

rect, the indictment still alleges mail fraud.[4]

■ The elements of fraud for "mail fraud" are well established: "(1) the defendant must have made an affirmative misrepresentation or nondisclosure; (2) that deception must be material; and (3) it must be done in contemplation of harm to the defrauded party or gain to the defendant." *United States v. Gallant*, 570 F.Supp. 303, 306–07 (S.D.N.Y.1983). Allegations of all the elements are clearly made against Pisani; whether they are true is a question for the jury. The alleged misrepresentations were in the financial disclosure statements. Indictment SS 83 Cr. 750 (DNE), at ¶ 49. It is alleged that would-be contributors were defrauded into contributing by these material deceptions.[5] *Id.* at ¶ 47. Finally, it is alleged that the object of these mistatements was the concealment and fulfillment of Pisani's fraudulent scheme to convert money for his benefit. *Id.* at ¶ 40.

■ Second, Pisani contends, "[n]otice to this defendant and all other candidates for political office in New York of what conduct may be charged as criminal is impossible under the Government's theory of the mail fraud statute." Pisani's Memorandum of Law, dated January 27, 1984, at p. 6. Notice, however, is clear. If a candidate makes a full and accurate disclosure on the financial disclosure statements, he avoids all risk of running afoul of the mail fraud statute. Nor is the government, by this prosecution, "seeking to impose a duty of complete candor or absolute disclosure on political candidates," under which they will have to disclose all "issues, actions, and affiliations which might deter potential

---

4. Pisani's contention that the New York State campaign laws do not restrict a candidate's use of funds is incorrect. New York Election Law 17–140 provides: "Any person who directly or indirectly by himself or through any other person in connection with or in respect of any election: ... 2. Pays ... any money ... for any purpose than the following matters and services ... is guilty of a class A misdemeanor ....." There follows a long, detailed list of permissible campaign expenses. Personal expenses, except those "necessary" for the campaign, are not among them.

Pisani contends that this provision does not limit a candidate's campaign expenses because it is in a section entitled "Furnishing money or entertainment to induce attendance at polls," and thus it is intended only to limit expenditures for vote buying. Nothing in the language of the provision supports this interpretation. Subsection (1) of Election Law § 17–140 limits the paid inducement mentioned in the title. Subsection (2) is separate and by its language limits all campaign expenses.

Furthermore, a construction that subsection (2) is a broad limit finds support in the November 3, 1979, New York State Board of Elections Formal Opinion #3, which states: "there is nothing in the Election Law which would prohibit using *surplus* campaign funds for any lawful purpose ..." (emphasis added). If the Election Law does not limit *surplus* funds, there is an implication that it does limit non-surplus funds spent during the campaign.

Pisani contends that "a candidate may determine what campaign funds he will put to 'active' campaign-related use and what campaign funds he will use for other purposes and at what times he may choose to do so." Affirmation in Reply to Government's Response to Defendant Pisani's Motion to Dismiss, at ¶ 10(c). This reasoning would eliminate any surplus/active distinction from the Election Law and would thereby read out of it any limitation on campaign expenditures. The Board of Elections, however, clearly intended to make the distinction. Surplus means remaining excess or left over. In addition, Opinion #3, provides that surplus funds may be spent on any lawful purpose "including the defraying of ordinary and necessary expenses incurred in connection with the duties as holder of an elected office." This provision clearly contemplates funds remaining after the election, as contrasted with funds expended during a campaign.

The indictment charges that the funds diverted were from active funds. The definition, if relevant, of exactly what active and surplus funds are is for the court to charge; the issue of whether the alleged diversions were in fact from active funds is for the jury to decide. The allegations are sufficient to maintain the charge that Pisani defrauded his campaign contributors.

5. The allegations of defrauding the Board of Elections would also survive even if Pisani did not *unlawfully* divert any money. In that case Pisani would still be under a statutory duty to make a full disclosure, New York Election Law §§ 14–102, 104, 108, 118, and the allegations of misrepresentations mailed to the Board of Elections with the object of deceiving the Board, to its detriment, would make out a violation of the mail fraud statute. *See United States v. Melvin*, 544 F.2d 767, 774 (5th Cir.), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977).

campaign contributors ...." *Id.* at 5. Under the government's theory candidates must make accurate financial disclosures. Surely, the accurate reporting of finances is not too much to demand.

■ Third, Pisani contends that the mailing of the financial disclosure statements was not in furtherance of the fraud, and therefore does not satisfy that element of a mail fraud charge. In *United States v. Elkin,* 731 F.2d 1005 (2d Cir.1984), the defendant had defrauded the Defense Department by submitting false progress payment requests and, after being paid, mailing a false letter of verification. The court held that because the letter was false and was necessary to lull the Defense Department into believing that the payment was proper, "the fact that the Verification Letter was mailed after the defendants received the progress payment in no way suggests that it was not sent in furtherance of the scheme to defraud." *Id.* at 1008. Pisani's alleged scheme entailed these facts. The financial disclosure statements, though mailed after the alleged diversion, were allegedly intended to lull the Board of Elections and would-be contributors into believing Pisani's expenditures were proper and were not for 'personal expenses. Hence, the mailings were in furtherance of the scheme to defraud.

■ Finally, Pisani contends that the mail fraud statute should not "give the federal government the authority to regulate political campaigns governed by state election law for state and local offices." Pisani's Memorandum of Law, dated January 27, 1984, at p. 9. This is an argument more properly before the Congress than before this court,[6] which has no power to restrict the application of a criminal law to activities squarely within its scope.[7]

■ As to specificity under Fed.R. Crim.P. 7(c), the indictment need only track the statutory language and state approximate times and places. *Bernstein, supra,* 533 F.2d at 786. The indictment states the time period during which the diversions from the campaign funds were carried out. It further states how much money was diverted and lists the funds from which the money was diverted. It states which disclosure statements were false and when they were mailed. It need do no more. Counts 12 through 27 properly allege mail fraud. Pisani's motion to dismiss these counts is therefore denied.

### 3. *Law Firm Mail Fraud*

Counts 27 through 31 charge Pisani with a scheme to defraud a lawfirm, in which he was at different times a partner and "of

6. This court does note that an argument could be made that the federal government, because it has the necessary resources and is relatively immune to state political intrigue, should help regulate fraudulent practices in state elections.

7. Pisani's contention that the government cannot use the mail fraud statute to enforce a general duty of honest government is wrong. The Second Circuit has held:

a public official may be prosecuted under 18 U.S.C. § 1341 [the mail fraud statute] when his alleged scheme to defraud has as its sole object the deprivation of intangible and abstract political and civil rights of the general citizenry. The definition of fraud is thus construed broadly to effectuate the statute's fundamental purpose ....

*United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied* — U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *see also United States v. Buckley,* 689 F.2d 893 (9th Cir.1982), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983) (lobbyist's intentional failure

to make disclosure in violation of statutory duty is contrary to public policy, fails to measure up to right dealing and thus constitutes fraudulent scheme).

The mail fraud statute is an excellent and necessary insurance policy for honest government. The mail fraud statute, in the words of Chief Justice Burger, "has traditionally been used against fraudulent activity as a first line of defense. When a 'new' fraud develops—as constantly happens—the mail fraud statute becomes a stop-gap device ...." *United States v. Maze,* 414 U.S. 395, 405–06, 94 S.Ct. 645, 651–52, 38 L.Ed.2d 603 (1974) (Burger, C.J., dissenting).

In the case at bar the public had an "intangible right" to a full and accurate disclosure of Pisani's campaign finances. Pisani, as a public official, had a duty to make that disclosure. Allegedly Pisani chose not to do so with the requisite intent to defraud. Those allegations are sufficient to establish fraud. The alleged use of the mails in furtherance of the scheme establishes a mail fraud charge.

counsel", and to defraud that firm's clients. The indictment alleges that the partners of the firm and clients of the firm were defrauded of money. Indictment SS 83 Cr. 750 (DNE), at ¶ 58. The indictment further alleges that the object of this fraud was for the benefit of Pisani. *Id.* at ¶ 60. The indictment further alleges that Pisani attempted to conceal the diversion of funds from the partners and from the clients. *Id.* at ¶¶ 61–63. Finally, the indictment alleges that certain mailings were made in furtherance of the alleged scheme. *Id.* at ¶ 65.

 Pisani contends that because a partner cannot legally steal from his partners, counts 27 through 31 do not allege offenses against the United States. The charge here is not theft or larceny, but fraud. Neither larceny or theft is an element of a mail fraud charge. The elements of a mail fraud charge are well settled: (1) the defendant must have made an affirmative misrepresentation or nondisclosure (in breach of a duty to disclose), (2) the deception must have been material, (3) it must have been done in contemplation of harm to the defrauded party or gain to the defendant, and (4) the defendant must have made or caused to be made a mailing in furtherance of the scheme. *United States v. Gallant, supra* 570 F.Supp. at 306–07. All the elements are alleged in the indictment in this case.

 At all times relevant to these counts Pisani is alleged to have been a partner or an employee of the law firm. A partner owes a fiduciary duty to his partners. *Lichtyger v. Franchard Corp.,* 18 N.Y.2d 528, 536–37, 277 N.Y.S.2d 377, 383–84, 223 N.E.2d 869, 873–74 (1966); *Rosen v. Rosen,* 78 A.D.2d 911, 432 N.Y.S.2d 921 (3d Dep't 1980); *Application of Lester,* 87 Misc.2d 717, 386 N.Y.S.2d 509, 512 (Sup.Ct. N.Y.Cty.1976); *Auld v. Estridge,* 86 Misc.2d 895, 382 N.Y.S.2d 897, 898 (Sup.Ct. Nassau Cty.1976). An employee owes a fiduciary duty to his employer. *United States v. Barta,* 635 F.2d 999, 1007 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *United States v. Margiotta,* 688 F.2d 108, 120–24

(2d Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Finally, a lawyer owes a fiduciary duty to his client. *United States v. Bronston,* 658 F.2d 920, 929–30 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). The indictment alleges a diversion of funds and a failure to disclose in violation of the above-mentioned fiduciary duties.

The information about these transactions was material for the partners in accounting for the partnership. The comingling and diversion of a client's money is certainly material to the client's decision about whether to retain his attorney.

Finally, the indictment also alleges that Pisani used the money diverted for his own benefit and made mailings in furtherance of the scheme.

 As to specificity the indictment states the time period when the fraud occurred. It states the address of the bank into which the funds were diverted. It even states specific instances of diverted funds and gives the amount, the date of the diversion, from whom the funds were diverted and to where. These specifics go well beyond the Fed.R.Crim.P. 7(c) standard articulated in *Bernstein, supra,* 533 F.2d at 786. The indictment therefore alleges offenses against the United States, and Pisani's motion to dismiss counts 27 through 31 is denied.

B. *Pisani's Motion to Dismiss Based on the Asserted Unconstitutionality of Fed.R.Crim.P. 6(g)*

1. *Adoption of Rule 6(g)*

Pisani contends that the indictment is invalid because the grand jury that indicted him ("Pisani Grand Jury") did so more than 18 months after its impanelment. He further contends the amended Fed.R.Crim.P. 6(g), under which the term of the Pisani Grand Jury was extended for six months beyond the 18 month period, was unconstitutionally amended to allow for such an extension.

The March 23, 1982 Additional Grand Jury Number 2 was duly impanelled in the Southern District on March 23, 1982. The term of this grand jury, pursuant to former Rule 6(g) in effect at the time of its impanelment, was 18 months. In October 1981, the Judicial Conference Advisory Committee on the Federal Rules of Criminal Procedure proposed amendments to the criminal rules. One proposal amended Rule 6(g) to allow the court to extend a grand jury by six months if an extension served the public interest. 30 Cr.L.Rptr. 3001 (Oct. 21, 1981). The Committee submitted the amendments to the Supreme Court, which by order dated April 28, 1983 adopted several of the proposals including the amended Rule 6(g). The Court thereafter transmitted the amendments to Congress, pursuant to 18 U.S.C. §§ 3771 and 3772, and they became law on August 1, 1983 after Congress took no action to modify, postpone or repeal them. On August 18, 1983, prior to the expiration of the Pisani Grand Jury, Chief Judge Constance B. Motley ordered its term extended six months to March 23, 1984. The latest indictment in this case was returned on March 8, 1984.

■ Pisani contends that an indictment is invalid if returned after the expiration of the grand jury and that the original term of the Pisani Grand Jury expired before the return of the indictment against him. On these points he is correct.

■ Pisani also contends that the Supreme Court could not constitutionally have used the "report and wait" procedure to amend the Fed.R.Crim.P. to allow the extension. Pisani reasons that the 18 month limit in the former Rule 6(g) was a substantive right accruing to all criminal defendants, that it could be changed only by Congress through express enactment followed by Presidential approval or an override of a Presidential veto, and that therefore an amendment by the "report and wait" procedure could not constitutionally have allowed for a judicial extension of a grand jury term. Pisani's reasoning falls on the incorrectness of his minor premise— the 18 month limit of former Rule 6(g) did not convey a substantive right to criminal defendants, rather it was purely procedural.

The procedural purpose of the 18 month limit has been articulated in *United States v. Armored Transport, Inc.,* 629 F.2d 1313, 1316 (9th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981) and in *United States v. Fein,* 504 F.2d 1170, 1178 (2d Cir.1974).

The history of the rules and statutes governing grand jury procedure supports this view of the 18 month limit. In the years after the ratification of the Constitution, grand juries were creatures of the court. Chief Justice Marshall wrote,

> It has been justly observed, that no act of Congress directs grand juries, or defines their powers. By what authority, then, are they summoned, and whence do they derive their powers? The answer is, that the laws of the United States have erected courts which are invested with criminal jurisdiction. This jurisdiction they are bound to exercise, and it can only be exercised through the instrumentality of grand juries. They are, therefore, given by a necessary and indispensable implication.

*United States v. Hill,* 26 Fed.Cas. p. 315 (No. 15,364) (C.C.Va.1809). At that time grand juries were impaneled for the "term of the Court." In each district, court would be in session for a term peculiar to that district during which all business, including grand jury business, would proceed. The grand jury expired with the end of the term. *United States v. Fein, supra,* 504 F.2d at 1173.

In the nineteenth century Congress took a hand in setting the procedure for impaneling grand juries and for their tenure. Sections 8 and 284 of the Judicial Code in substance provided that the grand jury could serve beyond the term of the court whenever so ordered by a court. In 1931, at the request of the Department of Justice to clarify the procedure for setting the tenure, *see Id.* at 1175 n. 6, Congress enacted 28 U.S.C. § 421, which limited such extensions to three terms. In 1941 Congress

again acted to clarify the procedure for setting the tenure of federal grand juries because a maximum of "three terms" meant a different period in each district. Amended section 421 made 18 months the maximum life, although not the initial term, of all federal grand juries. *Id.* at 1175–76; *see also* Notes of Advisory Committee on Rules, reprinted at Fed.R.Crim.P. 6, U.S.C.S. at 78, Note to Subdivision (g). In 1946, the former Rule 6(g), adopted by the "report and wait" procedure, eliminated entirely the confusing connection between the term of the court and the life of the grand jury, and provided instead for an 18 month uniform term for all grand juries. Finally, in 1983, amended Rule 6(g), adopted also by the "report and wait" procedure, allowed a six month extension to the usual 18 month grand jury term to provide flexibility to grand juries investigating the increasingly complex cases that have arisen since former Rule 6(g) was adopted more than 40 years ago. 30 Cr.L. Rptr. 3006–07 (Oct. 21, 1981).

The many changes in the procedure for determining the tenure of federal grand juries all emphasize the procedural nature of the rule. The purpose of each change was to articulate a rule that would enhance judicial efficiency. Nowhere in the legislative history is there an indication that Congress intended, by setting any of these various limits, to create a substantive right for criminal defendants. Defendant Pisani has not pointed to any such indication, and this court has found none.

 These procedural changes may be made under the "report and wait" method, pursuant to 18 U.S.C. § 3771. Congress enacted section 3771 in order to shortcut the cumbersome procedure of enacting legislation. The adoption of former Rule 6(g) by this method in 1946 changed the procedure for setting the tenure of federal grand juries [8] and has been accepted by courts. *See e.g. United States v. Armored Transport, Inc., supra,* 629 F.2d at 1316; *United States v. Macklin, supra,* 523 F.2d at 195; *United States v. Fein, supra,* 504 F.2d at 1173–1179. Indeed, the validity of the adoption of former Rule 6(g) is not questioned by Pisani. His contention that the latest amendment to the procedure for setting the tenure of a grand jury has suddenly changed the substantive rights of criminal defendants has no basis.

 Undoubtedly the fifth amendment, which mandates that no person be made to answer to a serious crime except upon indictment by a grand jury, requires a grand jury that is independent from the prosecutorial arm of the state. A grand jury might lose its independence, if its tenure lasts too long, and it might become a sword for the government. Protection against such an eventuality is a constitutional right, which is guarded by the courts. There is, however, no legislative history to show that Rule 6(g) or any of its predecessors was meant to protect that right. Rather these rules were meant to enhance procedural efficiency within the constitutional limit. Any rule on grand jury tenure must pass constitutional muster,[9] but Congress never intended to create an additional *statutory* right during the years it has adjusted grand jury procedure.[10]

---

**8.** Under the former statute, 28 U.S.C. § 421, grand juries served for the term of the court and could be extended up to 18 months, but only to finish business already begun during the term. Former Rule 6(g) made the term of all federal grand juries a uniform period of 18 months and thus eliminated the need for judicial extensions and allowed a grand jury to begin new business regardless of the term of the court.

**9.** An 18 month grand jury, extended six months for a total term of 24 months, is constitutional. *See* 18 U.S.C. § 3331 (36 month maximum) *United States v. Schwartzbaum,* 527 F.2d 249,

256 (2d Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976); *United States v. Ostrer,* 481 F.Supp. 407 (S.D.N.Y.1979).

**10.** *Fein,* cited by Pisani, is not to the contrary. In *Fein* the court held, based upon legislative history, that Congress meant its limits on grand jury tenure to cut off the power of the grand jury to return indictments. The court discussed in dicta without any citation to legislative history, "We *assume* that Congress determined that layman from the vicinage, traditionally acting as a screening device to protect their fellow citizens from unwarranted criminal charges ...

Because none of the amendments to grand jury procedure created any substantive rights among criminal defendants, those amendments could permissibly be made by "report and wait" adoption. Pisani's motion to dismiss the indictment as being returned beyond the lawful life of the grand jury is denied.

### 2. *Ex Post Facto Application*

Pisani contends that the Supreme Court reported the amendment to Rule 6(g) after the impanelment of the Pisani grand jury. Defendant concludes that an amended Rule 6(g) extension of the Pisani grand jury is "offensive to the Constitutional prohibition against *ex post facto* laws." Pisani's Memorandum of Law, at p. 26. Pisani's contention must be rejected because the amendment to Rule 6(g) was procedural and further did not work to Pisani's detriment.

 The prohibition against *ex post facto* laws was intended to "secure substantial personal rights against arbitrary and oppressive legislation, and not to limit the legislative control of remedies and modes of procedure which do not effect matters of substance." *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) (citations omitted) (whether judge or jury determines sentence for murder not a substantive right). Rule 6(g), as discussed at length in the preceding section, involves only procedural changes. Furthermore, the change in Rule 6(g) did not prejudice Pisani. Indeed, it allowed a reasoned and deliberate grand jury presentation rather than either a hurried presentation at the end of the term or the needless delay of impaneling a new grand jury both of which could prejudice a defendant.

In *United States v. Mitchell*, 397 F.Supp. 166, 170 (D.D.C.1974), *aff'd*, 559 F.2d 31 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933,

97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), the court, passing on the exact issue raised by Pisani, affirmed the "Watergate" grand jury's extension. That extension had been accomplished by special act of Congress *after* the grand jury's impanelment.

Finally, the Supreme Court, in reporting the amended rules to Congress made clear that they should apply where "just and practicable" to proceedings pending when the amendments took effect on August 1, 1983. Supreme Court Order, 97 F.R.D. 245 (1983).

 Pisani's motion to dismiss the complaint based on the contention that the application of amended Rule 6(g) to the grand jury that indicted him is an *ex post facto* law is denied.

### C. *Pisani's Motion to Compel Release of the Grand Jury Attendance Records*

Pisani contends that in the long and complex Pisani grand jury investigation there is no reasonable assurance that at least 12 of the grand jurors voting for indictment heard the critical evidence. Pisani further contends that the grand jury attendance records must be released to him so that he can make this determination with assurance. The court, at a conference held on January 11, 1984, denied Pisani's request. *See* Transcript *United States v. Pisani* 83 Cr. 750 (DNE) January 11, 1984 at 5.

 Pisani has made no showing of a deficiency of evidence presented to the grand jury. The reasoning behind Pisani's contention, which is based upon pure speculation, has been squarely rejected by the Second Circuit. *United States v. Colasurdo*, 453 F.2d 585, 596 (2d Cir.1971). The court finds no reason, upon considering Pisani's papers, to change its decision rendered on January 11, 1984. Pisani's motion

---

might by dint of longer service become themselves arms of the state ...." *Fein, supra,* 504 F.2d at 1178–79 (emphasis added). Even if Congress had this danger on its mind in setting the various limits, the legislative history shows it had no intent to create, each time it reset the limit, a new substantive, *statutory* right for criminal defendants.

The court has carefully searched the other two cases cited by defendant, though without any reference to specific pages, *Ex Parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887) and *United States v. Costello*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1959), and can find no support for the Defendant's reasoning.

to compel release of grand jury records is therefore denied.

### D. Pisani's Motion to Dismiss the Conspiracy Counts

Pisani contends that among the "overt acts" of the conspiracies charged in counts 1 and 5 are some alleged to have occurred before the beginning of the conspiracy. Pisani contends that these allegations make a "difficult, if not impossible, task that a jury will have in determining what is and what is not charged." Pisani's Memorandum of Law in Support of Motion to Dismiss Indictment, at 2. Pisani reasons that this defect should result in dismissal.

■ The allegations of acts occurring prior to the beginning of the conspiracy are clearly alleged as background to the conspiracy. They can not satisfy the "overt acts" element of the conspiracy charge. These principles are readily explained to a jury. Pisani's motion to dismiss the conspiracy counts is therefore denied.

### E. Pisani's Motion to Dismiss the Indictment by Joining the Motion of Defendant Godfrey

Pisani joins in the motions of defendant Godfrey, discussed hereafter, and asserts that the "taint" suffered by Godfrey inured to his detriment. See Notice of Motion to Dismiss, dated January 27, 1984. As discussed hereafter, the court concludes that Godfrey's "taint" argument is without merit. Accordingly, Pisani's motion to dismiss on those grounds is denied.

### F. Godfrey's Motion to Dismiss All Counts Against Her

Godfrey testified on seven occasions before the Additional January 1979 Supreme Court Grand Jury of the County of Albany. Her testimony on all these occasions received transactional immunity from New York State prosecution under New York Criminal Procedure Law § 190.40 and use immunity under New York Criminal Procedure Law §§ 50.10–50.20. Testimony from these appearances was presented to the Federal Grand Jury that ultimately indicted Godfrey on charges of perjury and obstruction of justice in connection with her appearances on July 28 and August 2, 1983 before that same Federal Grand Jury.

■ Godfrey moves to dismiss all counts against her on the ground that the Grand Jury's decision to indict was based in part on the immunized testimony she gave before a New York State Grand Jury. Godfrey contends that under the constitutional standard announced in Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the government was barred from using any immunized testimony because the use of any immunized testimony would violate Godfrey's fifth amendment right against self-incrimination by "tainting" the indictment.[11]

■ The fifth amendment provides: "No person ... shall be compelled in any criminal case to be a witness against himself ...." This privilege against self-incrimination, however, is limited by the right of the people, deeply rooted in Anglo-American jurisprudence, to have every persons' evidence. Kastigar, supra, 406 U.S. at 443–44, 92 S.Ct. at 1655–56. A corollary to the people's right to evidence is the fundamental responsibility of a citizen in a democratic polity to cooperate with lawful governmental enforcement of the laws; his right some day as an accused to confront witnesses against him and obtain witnesses in his favor may depend upon such cooperation. No one can shirk this responsibility, and, since at least the early eighteenth

---

**11.** Godfrey makes no argument that the use of the immunized state Grand Jury testimony violates the *statutory* grant of immunity, which she received prior to testifying before the State Grand Jury. *See* Defendant Godfrey's Memorandum of Law in Support of her Motion to Dismiss the Indictment at 4–5. Nor does Godfrey base any argument on the statutory grant of immunity before the federal grand jury pursuant to 18 U.S.C. § 6002. This is not surprising; the federal immunity statute "restrict[s] the grant of immunity to that required by the United States Constitution." *United States v. Apfelbaum*, 445 U.S. 115, 122, 100 S.Ct. 948, 953, 63 L.Ed.2d 250 (1980).

century, the government in Anglo-American law has been granted the power to ensure that no one does. *Id.* at 445, 92 S.Ct. at 1656.

■■■■ Neither the power of the people to compel testimony nor the right of persons against self-incrimination are absolute. Rather the Constitution seeks "a rational accomodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Kastigar, supra,* 406 U.S. at 446, 92 S.Ct. at 1657. Under this accommodation, the government may compel testimony if it grants the witness immunity. Indeed, the power of the government to compel testimony in the face of the right against self-incrimination through the grant of immunity has "become part of our constitutional fabric." *United States v. Apfelbaum,* 445 U.S. 115, 125, 100 S.Ct. 948, 954, 63 L.Ed.2d 250 (1980), *quoting Ullmann v. United States,* 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956). The question here is the scope of such immunity. This court concludes that the fifth amendment does not mandate that a witness receive immunity from prosecution for crimes of interfering with, obstructing or evading the truthseeking function of a tribunal before whom the witness is summoned.

■■■■ The immunity order granted to a witness to compel testimony is part of a bargain under which the witness agrees to aid the tribunal in its truthseeking function and the government agrees not to use against the witness any of the testimony *given in accordance with this bargain.* If the witness violates the bargain, the government may use the testimony to prove the violation; otherwise the government would have no means to enforce the bargain, and the accommodation between the privilege against self-incrimination and the right of the people to the truth would be a sham. Thus, "[T]he bargain struck is conditional upon the witness who is under oath telling the truth" at least insofar as the testimony may be used in actions that are reasonably necessary to enforce the bargain.[12] *United States v. Tramunti,* 500 F.2d 1334, 1342 (2d Cir.1974).

■■■■ So long as the witness's violation of the bargain is in the nature of perjury, contempt, obstruction of justice or some similar crime that impedes the truthseeking function of the tribunal, the government has the power, under the constitutional accommodation between the privilege against self-incrimination and the power to compel testimony, to enforce the bargain and prosecute the violation.[13] In *United States v.*

12. It is ultimately for the jury to decide whether the testimony before the jury was in fact false as alleged and hence whether the use was permissible. *Anzalone,* 555 F.2d 317, 320 (2d Cir.1977).

13. Many courts have found the use of compelled testimony permissible in a prosecution for perjury committed during that testimony on the ground that the perjury occurs after the grant of immunity. The immunity under the fifth amendment, it is argued, need only protect against the use of the testimony for crimes prior to the grant of immunity. The reasoning behind this rule is that a witness cannot confess to a crime he has not committed. At the time the witness receives immunity, which is the time at which he would assert his right against self-incrimination, he has not committed the crime of perjury, he cannot confess to it, and hence he needs no protection to keep the testimony he is about to give from being used to prosecute it. "The immunity does not extend *in futuro.*" *Tramunti, supra,* 500 F.2d at 1344.

The Supreme Court has in part adopted this reasoning. "[W]e conclude that the Fifth Amendment does not prevent the use of [a witness's] immunized testimony at his trial for false swearing because, at the time he was granted immunity, the privilege would not have protected him against false testimony that he later might decide to give." *Apfelbaum, supra,* 445 U.S. at 130, 100 S.Ct. at 957. The Court more specifically noted that the test of whether a statement is improperly self-incriminatory is whether it presents a "substantial and real" danger of self-incrimination when spoken, *id.* at 131, 100 S.Ct. at 957, and that generally "a future intention to commit" a crime "is not by itself sufficient to create a 'substantial and "real"' hazard that permits invocation of the Fifth Amendment." *Id* (citations omitted).

At what point in the course of a criminal enterprise, like the one with which defendant Godfrey is charged in which she had already allegedly prepared false documents to obstruct the grand jury investigation when she received immunity, the danger of self-incrimination be-

*Caron,* 551 F.Supp. 662 (E.D.Va.1982), for example, the defendant moved to dismiss two obstruction of justice counts on the ground that immunized testimony from the appearance at which the defendant had allegedly committed the offense was presented to the grand jury that returned the indictment. The court held that such a procedure was permissible under the federal immunity statute, 18 U.S.C. § 6002, and the constitution. *Id.* at 670–72.

The deep roots of the people's right, through the government, to enforce an immunity bargain, are revealed in the Supreme Court's opinions on the subject. The court, for example, has shown no reluctance to extend the statutory exceptions to the immunity granted a witness in order to allow the government to enforce the immunity bargain. In *Glickstein v. United States,* 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128 (1911) the Court heard an appeal by a defendant convicted of perjury based on immunized testimony given before a bankruptcy court under an immunity statute that allowed no exception for a perjury prosecution. Denying the appeal, the Court noted that as to the Constitutional consideration, "This must be the result, as it cannot be conceived that there is power to compel the giving of testimony where no right exists to require that the testimony shall be given under circumstances and safeguards as to compel it to be truthful." *Id.* at 142, 32 S.Ct. at 73. Similarly, in

*United States v. Bryan,* 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950), the Court heard an appeal by a defendant convicted of contempt for failure to turn over subpoenaed documents to a House committee. The defendant had been granted immunity under a provision that barred the subsequent use of the testimony except in a prosecution for perjury, and the defendant's testimony was introduced in his trial for contempt. The Court denied the appeal, over the constitutional objections of Justice Black, *id.* at 347, 70 S.Ct. at 738 (Black, J. dissenting), and the majority extended the permissible use of the testimony to include prosecutions for contempt.[14]

In this case Godfrey's allegedly perjurious testimony before the state grand jury was later presented to the Federal Grand Jury to prove her perjury and obstruction of justice before the latter. The original, allegedly perjurious testimony may be used to show a similar perjury or obstruction of justice before a later grand jury.[15] The people, albeit in the form of the federal rather than a state government, are enforcing the same bargain. There is no doubt that Godfrey could be prosecuted for her alleged perjury and obstruction of justice before the state grand jury and that her testimony before that grand jury could be used for that purpose. In using that testimony for a prosecution for exactly parallel crimes committed before the federal

comes substantial and real is a thorny question. In addition, the time distinction was seriously questioned by the concurring Justices in *Apfelbaum. See id.* 445 U.S. at 133, 100 S.Ct. at 958 (Brennan, J. concurring); *id.* (Blackmun, J. concurring). Finally, the implication of a strict before/after rule is that the immunized testimony could be used at a trial of the witness for a subsequently committed substantive crime, e.g. to show motive for a murder committed after the testimony, and such a use is of doubtful constitutionality. *See Id.* at 130, 100 S.Ct. at 956. This court need not digress down this avenue, however, because, as discussed herein, the use in the case of defendant Godfrey was a proper use to enforce the immunity bargain.

**14.** The court has made very clear that the immunity granted to compel testimony need not have the same effect as if the witness had been able to remain silent. *Apflebaum, supra,* 445

U.S. at 124–25, 100 S.Ct. at 953–54. Obviously if a witness could remain silent, he could avoid contempt, perjury or obstruction of justice charges, but the immunity granted need not have the same effect as silence and need not protect a witness against his willfully committing these crimes of interfering with the tribunal's truthseeking process.

**15.** The result would be different if the immunized testimony before an earlier grand jury is truthful and the testimony before a later grand jury is allegedly false. Then the government would be barred from using the earlier immunized testimony. *Tramunti, supra,* 500 F.2d at 1344. This is not, however, an exception to the government's power to enforce an immunity bargain because the witness would have fulfilled his bargain with respect to the original testimony, and that testimony therefore would be protected from use.

grand jury, the federal government is in effect enforcing the same immunity bargain.

Godfrey's motion to dismiss all counts of the indictment on the ground that they are based on immunized testimony is denied.

### G. *Godfrey's Motion to Dismiss All Counts Against her but the Perjury Counts*

■ Defendant Godfrey has moved to dismiss the obstruction of justice count on the ground that the same jury that heard her immunized testimony about the underlying alleged fraudulent scheme returned the indictment.[16] A grand jury that hears the immunized testimony of a witness may not later return an indictment against that witness for one or more of *the crimes that the grand jury was investigating* when it heard the immunized testimony. This rule does not require dismissal of the obstruction of justice count here for two reasons.

■ First, the basis for this per se rule lies in the "taint" rule discussed *supra*, but as concluded in the preceding section no "taint" problem arises in this case. Immunized testimony may not be used by the government against the witness when such use violates the witness's fifth amendment right against self-incrimination.[17] As discussed in the preceding section, however, Godfrey's immunity did not protect her from the use of her testimony in a subsequent prosecution for interfering with the truthseeking function of the grand jury; *a*

---

**16.** In the first superceding indictment, S 83 Cr. 750 (DNE), Godfrey was charged, by the same grand jury that heard her immunized testimony, with the substantive crime of mail fraud. The second superceding indictment, SS 83 Cr. 750 (DNE), brought by the same grand jury, charges Godfrey, aside from the perjury counts, with only one count, obstruction of justice; the mail fraud counts have been dropped. The defendant's motion to dismiss all counts of the indictment but the perjury counts, therefore, now applies only to the obstruction of justice count, count 8.

**17.** Whenever a grand jury improperly is presented with even transcripts of immunized testimony and later indicts the witness for cer-

---

*fortiori* the per se "same grand jury" rule has no applicability.

Second, the "same grand jury" rule, which restricts a grand jury that hears immunized testimony, bars only indictments for the crimes the grand jury was studying when it heard the immunized testimony. *United States v. Hinton*, 543 F.2d 1002, 1010 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). It does not bar Godfrey's indictment for obstructing justice because the grand jury was not studying this crime when she received immunity. Affidavit of AUSA Charles LaBella, sworn to March 9, 1984, at ¶ 19; *United States v. Tucker*, 495 F.Supp. 607, 615 (S.D.N.Y.1980).

■ Defendant Godfrey's motion to dismiss all counts but the perjury counts is therefore denied.

### H. *Godfrey's Motion to Sever*

Godfrey moves to sever her trial from Pisani's. In the alternative she moves to sever the trial of the counts alleging a fraudulent scheme in connection with the TSCCW and Joseph Mallon's summer house, counts 1 through ten, three of which charge defendant Godfrey with perjury and obstruction of justice, from the other counts, which allege charges only against defendant Pisani. Godfrey raises two grounds for severance—misjoinder under Fed.R.Crim.P. 8(b) and substantial prejudice under Fed.R.Crim.P. 14.

*United States v. Barton*, 647 F.2d 224, 239 (2d Cir.1981), controls the joinder issue:

tain crimes, the government has a heavy burden of showing that there exists a basis for the indictment wholly independent of the immunized testimony. The Second Circuit has ruled that when a grand jury hears the immunized testimony live, the danger of "taint" is so great that, as a per se rule, that grand jury may not indict the witness for certain crimes. *United States v. Hinton*, 543 F.2d 1002 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). This restriction on prosecution for certain crimes, however, as discussed in the preceding section, does not encompass crimes involving interference with the truthseeking function of the grand jury.

"Rule 8(b) allows the joinder of a defendant who is not named in all counts of the indictment .... two or more defendants may be charged in the same indictment if they are alleged to have participated in the same series of acts." The only possible question raised by Godfrey's motion under Rule 8(b) is whether Pisani's frauds against the TSCCW, the campaign funds and his law firm, constitute a "series of acts" under *Barton*.[18]

In *Barton* the court found that counts alleging criminal possession of destructive devices, several bombings and bombing attempts, which were related only in that they were part of a struggle between rival underworld factions, and an obstruction of justice charge against only two of the defendants all charged one series of acts. *Id.* at 239–40. One defendant, Betti Frassetto, was charged only with obstruction of justice before a grand jury. Betti Frassetto appealed on the ground of misjoinder under Rule 8(b), and the court found that the obstruction charge was "integrally related to Counts Eleven and Twelve, which charged Frank Frassetto, Anthony Chirico, and Celestino with unlawful possession on June 28 of the explosives ...." *Id.* at 240. Although Betti Frassetto was not charged in any count but the obstruction of justice, and although the obstruction of justice related to only two of the fourteen counts in the indictment, the court affirmed the trial court's refusal to sever.[19]

■ Defendant Godfrey is in a position almost identical to that of Betti Frassetto. The acts alleged in the case herein constitute allegations of one series of acts by defendant Pisani (and others not charged in this indictment) to enrich himself through fraud at the expense of others and to conceal these frauds from the proper authorities—the IRS, the New York State Board of Elections, and the grand jury. Godfrey is charged with participating, by obstruct-

ing justice and perjuring herself, in one part of this scheme to enrich Pisani and herself. These allegations are all that is necessary to justify joinder of all the charges herein and joinder of the defendants Pisani and Godfrey. Godfrey's motion to sever on the grounds of misjoinder is therefore denied.

■ Under Fed.R.Crim.P. 14, Godfrey bears the heavy burden of demonstrating substantial prejudice as a result of a joint trial. *See, e.g., United States v. Lord*, 565 F.2d 831, 839 (2d Cir.1977). Godfrey has fallen far short of meeting that burden.

This trial is not nearly as complex a trial as that in *United States v. Branker*, 395 F.2d 881 (2d Cir.1968). In *Branker*, "[o]riginally twelve defendants and six co-conspirators were named in eighty-four counts." *Id.* at 887. The one conspiracy count naming all the defendants was dismissed by the court following trial. The court in that case noted that with so many defendants and so many counts it would be "difficult for a juror to keep the various charges against the several defendants and the testimony as to each of them separate in his mind." *Id.* at 887–88. Even so, the court severed only as to four of the defendants. By contrast, the case against Pisani and Godfrey is relatively simple. Because there are only two defendants, a juror can easily keep clearly in mind the relevance of evidence—it will apply to Pisani, to Godfrey or to both. In *Branker* because there were twelve defendants the number of combinations of defendants to which evidence could apply was an order of magnitude greater than here.

Godfrey also asserts in support of her motion to sever that her immunized testimony, admissible against Pisani, will be inadmissible against her because it was immunized. This court has concluded, *supra*, that Godfrey's grand jury testimony

---

**18.** Defendant Pisani has not challenged the propriety of the joinder of the charges in the indictment, and hence defendant Pisani has not raised the contention that the acts do not constitute one "series of acts."

**19.** In *United States v. Ostrer*, 460 F.Supp. 1388 (S.D.N.Y.), the court found joinder appropriate where various counts alleged embezzlement and tax evasion spanning ten years.

may be used against her in the perjury and obstruction of justice counts pending before her.

 In addition, the "spill-over" effect raised in *United States v. Sampol,* 636 F.2d 621, 643 (D.C.Cir.1980), and relied upon by Godfrey, is not present here. The spill-over referred to the prejudice against a defendant in an indictment that in its main charged several others with crimes relatively far more heinous than those charged against the defendant who sought severance. Furthermore, the spill-over arose also because the evidence in support of the charges against the defendant who moved for severance was substantially weaker than the evidence against his codefendants. In *Sampol,* the defendant seeking severance was charged with obstructing justice and the other defendants were charged with murder, conspiracy and bombings. The bulk of the charges against Pisani, by contrast, involve fraud and tax evasion, crimes no more heinous than the charges against Godfrey. Furthermore, Godfrey has not even made an argument that the evidence against her is less persuasive than the evidence against Pisani. Finally, the spill-over in *Sampol,* was aggravated by statements of conspirators admitted against the conspirators, under the exception to the hearsay rule, but not against the defendant who moved to sever, who was not charged as a conspirator. The spill-over effect against Godfrey is relatively minor. The court can instruct the jury carefully that each defendant must be considered separately. A defendant, to obtain severance, must show more than that she has a better chance of acquittal at a separate trial. *United States v. Cassino,* 467 F.2d 610, 623 and nn. 37–39 (2d Cir. 1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 957, 34 L.Ed.2d 276 (1973).

 Godfrey's final assertion in favor of severance is that a joint trial will subject her to a five or six week trial and impose on her the costs of counsel for that period, when she could be tried alone in a week. Consideration of cost and waste is a minor factor in a determination to sever, and can-

not, by itself, justify severance. In addition, the cost to Godfrey must be weighed against the efficiency of a joint trial. Godfrey has not met her burden of showing the balance of efficiency tips in her favor.

Godfrey's motion to sever based upon Rule 8(b) and Rule 14 is denied.

## CONCLUSION

The motions of defendants Godfrey and Pisani are denied in all respects.

SO ORDERED.