UNITED STATES of America, Appellee,

v.

Paul SKULSKY, and Marc
Pozner, Appellants.

Appeal of Paul SKULSKY, Appellant
in No. 85–5123.

Appeal of Marc POZNER, Appellant
in No. 85–5124.

Nos. 85–5123, 85–5124.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
March 4, 1986.

Decided March 13, 1986.

Jonathan L. Goldstein, Richard D. Shapiro, Bruce S. Etterman, Hellring, Lindeman, Goldstein, Seigal, & Greenberg, Newark, N.J., for appellant Skulsky.

Marc Pozner, pro se.

Thomas W. Greelish, U.S. Atty., Roger J. Bernstein, Victor Ashrafi, Asst. U.S. Attys., Newark, N.J., for appellee.

Before ALDISERT, Chief Judge, SEITZ, and ADAMS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Paul Skulsky and Marc Pozner appeal sentences imposed after their jury convictions for various federal offenses. This court has jurisdiction over their appeals under 28 U.S.C. § 1291.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 1977, Paul Skulsky, Roger Maggio, and Stuart Harris [hereinafter referred to collectively as the "Principals"] formed a number of companies for the purposes of acquiring, constructing, managing, and operating cable television franchises in several states. These companies included Cable/Tel Corporation; Cable Promotions, Inc.; Cable Finance Systems; American Cablevision Management Corp.; Six Star Cablevision Management, Inc.; Six Star Cablevision, Inc.; and Micro Constructors [hereinafter referred to collectively as the "Cable/Tel companies"].

To raise the capital necessary to carry out their plans, the Principals decided to market the cable systems as tax shelters. They prepared a "Confidential Memorandum" for prospective investors that outlined the tax shelters' operation and highlighted the benefits they could anticipate in the form of investment tax credits and deductions for depreciation, operating expenses, and so forth. The Principals also put together a sales force to market the tax shelters. In 1978, apparently buoyed by the success of their 1977 efforts, the Principals decided to market additional cable television tax shelters. Once again, they prepared a "Confidential Memorandum," assembled a sales force, and successfully marketed the tax shelters.

Also in 1978, in order to reduce their own tax liabilities, the Principals invested in a company called PMV, Inc., which was owned by Marc Pozner. PMV was apparently organized to engage in, among other things, the development of a peat moss mining business in New Jersey, which would provide defendants with substantial 1978 tax savings. In addition, the government introduced evidence at trial to show that defendants used PMV to funnel the sales proceeds of the cable television tax shelters to Swiss bank accounts, resulting in sizable research and development tax deductions for 1979 and 1980; Pozner was alleged to have filed false corporate tax returns for PMV in these years to conceal the fraudulent nature of these transactions.

In 1984, after an investigation spanning approximately two and one-half years and more than one grand jury, a thirty-two count indictment was handed down naming Paul Skulsky, Roger Maggio, Stuart Harris, and Marc Pozner as defendants. All four were named in every count. Count 1 charged them with conspiring to defraud the Internal Revenue Service ("I.R.S.") in violation of 18 U.S.C. § 371. Counts 2 through 13 and Counts 26 through 31 charged them with aiding and abetting the filing of false 1977 tax returns of twelve named investors in the cable television tax shelters and with aiding and abetting the filing of false corporate tax returns, respectively, in violation of 18 U.S.C. § 2 and 26 U.S.C. § 7206(2). Counts 14 through 20 charged them with mail fraud in violation of 18 U.S.C. § 1341. Counts 21 and 22 charged them with making false statements to the I.R.S. in violation of 18 U.S.C. § 1001. Counts 23 through 25 charged them with income tax evasion for the year 1978 in violation of 26 U.S.C. § 7201. Finally, Count 32 charged them with a RICO violation under 18 U.S.C. § 1962(c).

Prior to trial, Maggio pleaded guilty to one count of the indictment and became a government witness. The other three defendants, after numerous pretrial motions and hearings, were tried by the district

court sitting with a jury. However, Harris pleaded guilty to two counts of the indictment at the conclusion of the government's case-in-chief, and Skulsky and Pozner chose not to present a defense to the jury.

After five days of deliberation, the jury returned a verdict. Skulsky was convicted on all counts except Counts 1 (conspiracy) and 19 (mail fraud); Pozner was convicted on Counts 23 through 30, and acquitted on all other counts. The district court, after denying defendants' post-trial motions, sentenced Skulsky to a total of four years of imprisonment, five years of probation with community service, and a fine of $40,000.[1] The district court sentenced Pozner to a total of eighteen months of imprisonment, five years of probation with community service, and a fine of $15,000. These appeals followed.

## II. THE GRAND JURY ISSUES

After the present indictment was filed, the Tax Court scheduled an evidentiary hearing in the case of *Abrams v. Commissioner*, No. 17465–82. The purpose of the hearing was to determine whether the I.R.S. had utilized grand jury materials in connection with the preparation of a deficiency notice sent to Abrams, who was an investor in one of defendants' cable television tax shelters. Subpoenas were issued for two witnesses: Walter Pagano, a former I.R.S. Agent; and Robert Conrad, an I.R.S. Agent.

The government first sought to have the Tax Court hearing postponed. When that failed, the government applied *ex parte* to the district court for an order restraining Pagano and Conrad from testifying until the issue of grand jury secrecy could be resolved by the district court. The district court entered a temporary restraining order to enforce the secrecy requirements of Fed.R.Crim.R. 6(e) while it considered the issue further. As a result, Pagano and Conrad did not testify in the Tax Court.

The district court then held a hearing to determine whether it should hold its own evidentiary hearing on the Rule 6(e) issue or, instead, permit Pagano and Conrad to testify in the Tax Court. All counsel in this case, plus the attorney representing Abrams in the Tax Court, were present at this hearing. The government argued, apparently without opposition, that the district court was the appropriate forum to determine the Rule 6(e) issue. The defendants did object, however, to the government's prior *ex parte* presentation to the district court, and requested an evidentiary hearing into what transpired during the *ex parte* application. The district court denied this request.

The district court did decide, however, to hold a hearing concerning defendants' allegations that Pagano had disclosed grand jury information to Conrad in violation of Rule 6(e). After hearing testimony from Pagano and Conrad, the district court found, without discussion, that there had been no violation of grand jury secrecy. After the trial, the district court again took testimony on this issue, this time from I.R.S. Special Agent Alan Rebovich. Once again, the district court found, this time with Findings of Fact and Conclusions of Law, that there had been no violation of grand jury secrecy.

### A. *The Ex Parte Hearing Issue*

Skulsky and Pozner first argue that their convictions must be reversed because the district court refused to conduct an evidentiary hearing concerning the *ex parte* communication. The government, on the other hand, argues that the *ex parte* communication did not, and in fact could not, infringe defendants' rights; alternatively, the government argues that even if the *ex parte* communication was improper, it did not prejudice the defendants in any way. Defendants argue that our standard of review of the district court's decision not to hold an evidentiary hearing in such circumstances is plenary; the government argues that it is for abuse of discretion. We

---

1. Skulsky also entered into a consent judgment of forfeiture to the United States in the amount of $250,000, which is itself subject to the outcome of this appeal.

will assume, without deciding, that our review is plenary.

Initially we observe that the *ex parte* communication did not directly implicate the defendants. They were not parties to the Tax Court action, nor did they issue the subpoenas involved. The *ex parte* proceeding and resulting restraining order directly affected only Abrams, the litigant in the Tax Court. Under these circumstances, we question whether defendants even had standing to be heard on the question of which forum, the district court or the Tax Court, was the preferable one in which to resolve the underlying substantive question of whether the secrecy of the grand jury had been breached.

Defendants suggest, however, that the government may have imparted factual information to the district court during the *ex parte* proceeding with respect to the alleged violations of Rule 6(e), and that this entitled them to be present at the proceeding, or at least to an evidentiary hearing to determine whether the government did impart such information. After reviewing the record of the subsequent hearing in the district court on whether it should hold an evidentiary hearing on the alleged abuses, we believe that this suggestion is unfounded. At that hearing, the district court, in response to defendants' request to cross-examine the Assistant United States Attorney involved, stated that:

> Gentlemen, there was no transcript of last week's proceeding. There was a submission to the Court *ex parte* of the papers which you have, nothing more or less.

> A review by my chambers of the papers, some consideration within chambers without counsel of the posture, the manner, what appeared to be involved.

> Counsel was invited in to explain the papers again. I heard what was in the papers, an explanation of what was in the papers, and determined to sign the papers. That's all there was.

This statement, as well as others made by the district court during the course of the same hearing, affirmatively negates any suggestion that the merits of the underlying question were discussed. Instead, the *ex parte* application was appropriately limited to the procedural question of which forum should determine whether Rule 6(e) had been violated. Under these circumstances, the *ex parte* proceeding could not prejudice the defendants.

We hold, therefore, that the district court properly denied defendants' request for an evidentiary hearing on this issue. We note, however, that in the future the district court would be well advised to have such proceedings transcribed to prevent misunderstandings like that at issue here.

### B. *The Alleged Violations of Rule 6(e)*

Skulsky and Pozner next argue that Conrad improperly disclosed material gained in the course of his civil audit of the Cable/Tel companies to the grand jury, and that the district court's finding to the contrary is clearly erroneous.[2] They also argue that the district court erred in not conducting a full and complete evidentiary hearing on this issue.

Admittedly, the I.R.S. may not gather evidence for a criminal prosecution through the consensual civil audit process by affirmatively misrepresenting its intentions. *See, e.g., United States v. Irvine,* 699 F.2d 43, 45–46 (1st Cir.1983). In the present case, however, the district court conducted three days of hearings on this issue, two before trial and one after trial, after which it found, *inter alia,* that the criminal investigators had not "used the civil audit inquiries being conducted by Conrad as a stalking horse for the Grand Jury investigation." Instead, the testimony indicated that Conrad's assignment was to conduct a civil audit of the corporate tax returns of the corporations utilized by the

---

**2.** At the district court hearing on the Rule 6(e) issues, the defendants also argued that Pagano provided Conrad with information from the grand jury investigation. Defendants have not pursued this argument on appeal, however, nor have they challenged the district court's finding of fact to the contrary.

defendants to market and operate the cable television tax shelters. As a result, Conrad, pursuant to I.R.S. guidelines, made several fraud referrals to the I.R.S.'s criminal investigation division, which resulted in his meeting with Rebovich on several occasions to discuss the referrals.

■ After reviewing the record concerning this issue, we hold that the district court's finding that "[t]here is no showing that Conrad was used either directly or indirectly to gain information for the Grand Jury" is not clearly erroneous. We also reject defendants' contention that the district court committed an abuse of discretion in limiting the scope of the evidentiary hearing on this issue. The record indicates that defendants were given substantial latitude to investigate and develop their allegations on the merits.

### C. The Rule 6(g) Issue

■ Finally, Skulsky and Pozner assert that the indictment was defective in that it was returned by a grand jury whose term was unconstitutionally extended. The crux of this argument involves the claim that the eighteen-month limit on the tenure of a grand jury under former Rule 6(g) was a substantive constitutional or statutory right.[3] As such, they argue that Rule 6(g) could not constitutionally be amended by the "report and wait" provisions of 18 U.S.C. §§ 3771 and 3772; instead, they claim that such a change could be effected only by Congress through express enactment followed by presidential approval. Our review of this issue is plenary.

At the outset, we acknowledge that defendants have a substantive constitutional right to be indicted by a grand jury that is independent of prosecutorial control. Sim-

ilarly, we generally agree with the observation that "laymen from the vicinage, traditionally acting as a screening device to protect their fellow citizens from unwarranted criminal charges by over-eager prosecutors might by dint of longer service become themselves arms of the state instead of representatives of the citizenry." United States v. Fein, 504 F.2d 1170, 1178–79 (2d Cir.1974). However, we fail to perceive how it follows from these two assumptions that the eighteen-month limitation of former Rule 6(g) is a substantive, not procedural, right.

First, it is clear that the eighteen-month limitation is not constitutionally mandated. See United States v. Schwartzbaum, 527 F.2d 249, 256 (2d Cir.1975) (upholding validity of 18 U.S.C. § 1331, which permits term of grand jury impaneled pursuant to the Organized Crime Control Act to be extended up to thirty-six months), cert. denied, 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976). Second, there is nothing in the legislative history to demonstrate that former Rule 6(g) or any of its predecessors was meant to protect the underlying constitutional right, or to create an additional substantive statutory right. United States v. Pisani, 590 F.Supp. 1326, 1339 (S.D.N.Y. 1984), rev'd in part on other grounds, 773 F.2d 397 (2d Cir.1985).

Instead, we believe that the many changes in both the grand jury's tenure and the method of determining its tenure:

> emphasize the procedural nature of the rule. The purpose of each change was to articulate a rule that would enhance judicial efficiency. Nowhere in the legislative history is there an indication that Congress intended, by setting any of these various limits, to create a substantive right for criminal defendants.

---

3. Under former Fed.R.Crim.P. 6, a grand jury served at most for a period of eighteen months. However, effective August 1, 1983, Rule 6 was amended to permit a grand jury to serve, where appropriate, up to twenty-four months:

   (g) Discharge and Excuse. A grand jury shall serve until discharged by the court, but no

grand jury may serve more than 18 months unless the court extends the service of the grand jury for a period of six months or less upon a determination that such extension is in the public interest.

Fed.R.Crim.P. 6(g).

*Pisani,* 590 F.Supp. at 1339; *accord United States v. Pisani,* 773 F.2d 397, 405 (2d Cir.1985) ("Its very nature ... demonstrates the procedural character of the amendment to rule 6(g), which was adopted after a history of congressional experimentation with grand jury tenure.").

Finally, it is perhaps worth noting that former Rule 6(g), which established the eighteen-month term upon which defendants seek to rely, was itself adopted by the very same "report and wait" procedure used to enact the challenged 1983 amendment. We find it at least somewhat perplexing that the rule governing the tenure of the grand jury cannot be amended in the manner by which it was enacted. *Accord Pisani,* 773 F.2d at 405.

█ Under these circumstances, we think that defendants have mischaracterized Rule 6(g) as a substantive, rather than procedural, right. Thus, we agree with the Second Circuit that defendants' "indictment by a grand jury whose tenure had been extended pursuant to the 1983 amendment of rule 6(g) was not invalidated by the manner in which the amendment authorizing that extension had been adopted."[4] *Pisani,* 773 F.2d at 405.

### III. SUFFICIENCY OF THE EVIDENCE ISSUES

Skulsky argues that the evidence was insufficient to support the jury's guilty verdicts on Counts 2 to 18, 20 to 29, and 32; Pozner argues that the evidence was insufficient to support the jury's guilty verdict on Counts 23 to 29. In our review of the sufficiency of the evidence, we "must view the evidence in the light most favorable to the prosecution, and resolve all reasonable inferences therefrom in its favor. Credibility determinations are for the jury. Viewing the evidence in this light, [we] must uphold the jury's verdict unless no reasonable jury could conclude beyond a reasonable doubt that the defendant[s committed the offenses]." *United States v. Jannotti,* 673 F.2d 578, 598 (3d Cir.) (*in banc*) (citations omitted), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). "Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the factfinders was permissible." *United States v. Ashfield,* 735 F.2d 101, 106 (3d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 180, 83 L.Ed.2d 122 (1984).

█ After reviewing the record before us, we conclude that the jury reached a permissible verdict with respect to both Skulsky and Pozner. For example, with respect to Counts 2 to 13, the false filing counts, the government presented sufficient evidence from which the jury could conclude that Skulsky's conduct constituted more than a "frank difference of opinion" with the I.R.S. about when a cable television system is eligible for depreciation under the Internal Revenue Code. As a result, the jury could reasonably conclude that Skulsky intended to and did provide the investors with false information for their tax returns, thus satisfying the "willfullness" requirement of 26 U.S.C. § 7206(2). And with respect to Counts 14 to 18 and 20, the mail fraud counts, the government presented sufficient evidence from which the jury could reasonably con-

---

**4.** We also reject defendants' argument that the amendment to Rule 6(g) should not be applied to a grand jury impaneled before the effective date of the amendment. When it reported the amended rules to Congress, the Supreme Court made clear that they should apply where "just and practicable" to proceedings pending when the amendments took effect on August 1, 1983. Supreme Court Order, 97 F.R.D. 245 (1983). In addition, the Constitution does not prohibit the retroactive application of a procedural rule like Rule 6(g), *cf. United States v. Mitchell,* 397 F.Supp. 166, 170 (D.D.C.1974) (upholding, in the face of a different legal challenge, Congressional extension of the Watergate grand jury by statute enacted during the grand jury's term), *aff'd,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *see also Pisani,* 590 F.Supp. at 1340, nor does such application offend the Constitutional prohibition against *ex post facto* laws, *id.*

clude that Skulsky knowingly and intentionally participated in defrauding the I.R.S. and the investors by providing false information to the latter individuals for their 1978 tax returns, thus satisfying the intent requirement of 18 U.S.C. § 1341.[5] *See, e.g., United States v. Sturm,* 671 F.2d 749, 751 (3d Cir.) (requiring proof of specific intent to defraud), *cert. denied,* 459 U.S. 842, 103 S.Ct. 95, 74 L.Ed.2d 86 (1982).

We also believe that with respect to Counts 21 and 22, the false statement counts, the government introduced sufficient evidence from which a reasonable jury could conclude that Skulsky knew that the statement involved in Count 21 was false, and that the false statement involved in Count 22 was not the result of mistake or administrative error, but was knowing and willful. And with respect to Counts 23 to 29, the tax evasion and false filing counts, the government introduced evidence sufficient to support the jury's conclusion that Skulsky and Pozner willfully evaded their tax obligations, and that they aided and abetted their partners in evading their tax obligations.

## IV. CONCLUSION

Accordingly, the judgments of sentence imposed on defendants Skulsky and Pozner will be affirmed.[6]

---

**5.** We also reject, without further discussion, Skulsky's assertion that there was insufficient proof that the mailings involved in Counts 15 to 18 and 20 were "closely related to the fraudulent scheme" so as to bring his conduct within the statute. And it is likewise apparent that Skulsky's conviction on Count 32, the RICO charge, must be affirmed.

**6.** In addition to those objections discussed in the body of this opinion, defendants raise the following issues on appeal:

(1) Whether the district court erred in admitting Swiss bank records as evidence where the government allegedly obtained the records in violation of the applicable statutes, court orders, and international treaties, and without affording defendants procedural due process;

(2) Whether the district court erred when it refused to conduct an evidentiary hearing on defendants' claims of governmental intrusion

into confidential defense strategy, and when it denied defendants' motion to dismiss on this basis;

(3) Whether the district court erred when it denied defendants' repeated requests to transfer the situs of the trial from Trenton to Newark;

(4) Whether the district court erred when it denied Pozner's repeated requests for a severance;

(5) Whether the district court denied Pozner's right to effectively cross-examine his co-defendant Maggio; and

(6) Whether the government failed to disclose evidence favorable to Pozner in violation of *United States v. Brady,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

After reviewing the applicable portions of the record and defendants' legal arguments, we find these objections to be wholly without merit and dismiss them without further discussion.